## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| HITACHI CAPITAL AMERICA CORP. | ) | |
| | ) | |
| Petitioner/Cross-Respondent | ) | |
| | ) | Nos. 14-1161 |
| v. | ) | 14-1177 |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | |
| Respondent/Cross-Petitioner | ) | |
| | ) | |

## JOINT MOTION TO VOLUNTARILY DISMISS, WITH PREJUDICE, THE PETITION FOR REVIEW AND TO DISMISS, WITHOUT PREJUDICE, THE CROSS-APPLICATION FOR ENFORCEMENT

To the Honorable Judges of the United States Court of Appeals for the District of Columbia Circuit:

Pursuant to Federal Rule of Appellate Procedure 42(b), Hitachi Capital America Corporation ("the Company"), by its counsel, and the National Labor Relations Board ("the Board"), by its Deputy Associate General Counsel, respectfully move the Court for leave to voluntarily dismiss, with prejudice, the Company's petition for review and to dismiss, without prejudice, the Board's cross-application for enforcement in the above-captioned case, and show:

1.    On August 28, 2014, the Company filed with the Court a petition for review of the Board's decision and order in *Hitachi Capital America Corp.*, 361

NLRB No. 19 (2014) (see Attachment 1).  The Board cross-applied for enforcement of its order on September 12, and the Court consolidated the appeals.

2.     Since then, the Company and the Board have sought to resolve these consolidated cases without further litigation or the costs associated with such litigation.  The parties have reached such an agreement.

3.     The parties, therefore, request that this Court dismiss, with prejudice, the Company's petition for review.  The parties also ask that the Court dismiss the Board's cross-application without prejudice to the Board's right to file a future application for enforcement, if necessary, to enforce the "continuing obligation" imposed on the Company by the Board's Order.  *See NLRB v. Mexia Textile Mills*, 339 U.S. 563, 567 (1950) (Because "[a] Board order imposes a continuing obligation" and because "the Board is entitled to have [any] resumption of the unfair practice barred by an enforcement decree," an employer's compliance does not deprive the Board of the right to secure enforcement of the order from an appropriate court).  *Accord NLRB v. Raytheon Co.*, 398 U.S. 25, 27-28 (1970).

4.     Each side is to bear its own costs.

5.     Lawrence Peikes and Jeffrey Babbin, counsel for the Company, have given the Board permission to sign this motion on their behalf.

WHEREFORE, the parties respectfully request that their joint motion be granted, and that the petition for review be dismissed with prejudice and the cross-application for enforcement be dismissed without prejudice.

Respectfully submitted,

For the Board:                          /s/ Linda Dreeben
                                        Linda Dreeben
                                        Deputy Associate General Counsel
                                        National Labor Relations Board
                                        1099 14th Street, NW
                                        Washington, D.C. 20570
                                        (202) 273-2960

Dated: February 2, 2015

For the Company:                        /s/ Lawrence Peikes
                                        /s/ Jeffrey Babbin
                                        Lawrence Peikes & Jeffrey Babbin
                                        Wiggin and Dana LLP
                                        Two Stamford Plaza
                                        281 Tresser Boulevard
                                        Stamford, CT 06901
                                        (203) 363-7600

Dated: February 2, 2015

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| HITACHI CAPITAL AMERICA CORP. | ) | |
| | ) | |
| Petitioner/Cross-Respondent | ) | |
| | ) | Nos. 14-1161 |
| v. | ) | 14-1177 |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2015, I electronically filed the foregoing

document with the Clerk of the Court for the United States Court of Appeals for

the District of Columbia Circuit by using the CM/ECF system.  I certify that the

foregoing document will be served via the CM/ECF system on the following

counsel, who are registered CM/ECF users:

Lawrence Peikes
Wiggin and Dana LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT 06901
(203) 363-7600

Jeffrey R. Babbin
Wiggin and Dana LLP
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400

s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1099 14th Street, N.W.
Washington, D.C.  20570

Dated at Washington, D.C.
This 2d day of February 2015

**Attachment 1:  Decision of the National Labor Relations Board**

As required by Circuit Rule 27(g)(2)

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Hitachi Capital America Corp.** *and* **Virginia Kish.** Case 34–CA–013011

August 8, 2014

DECISION AND ORDER

BY MEMBERS MISCIMARRA, HIROZAWA, AND SCHIFFER

On July 11, 2012, Administrative Law Judge Mindy E. Landow issued the attached decision. The Respondent filed exceptions and a supporting brief. The General Counsel filed an answering brief, and the Respondent filed a reply brief.[1]

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings as modified,[2] and conclusions and to adopt the judge's recommended Order as modified and set forth in full below.[3]

1. We affirm the judge's finding that the Respondent violated Section 8(a)(1) by discharging employee Virginia Kish. We agree with the judge that the General Counsel met his initial evidentiary burden under *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982). The record establishes that Kish engaged in protected concerted activity when she sent several emails to supervisors and/or agents of the Respondent questioning the Respondent's new Inclement Weather Day (IWD) policy on February 3, 2011; that the Respondent knew or suspected that Kish's activity was concerted; and that the Respondent demonstrated animus towards Kish's protected activity by giving her a warning concerning her emails.[4] We also agree with the judge, for the reasons stated by her, that the Respondent failed to show, under *Wright Line*, that it would have discharged Kish even in the absence of her protected concerted activity.

With respect to the Respondent's knowledge that Kish's activity was concerted, we adopt the judge's findings, for the reasons she stated.[5] Our dissenting colleague posits that the Respondent had no knowledge of Kish's protected activities. We agree with the judge that the evidence clearly demonstrates otherwise.

As Kish's conversation with fellow employee Diane Cocchia on the morning of February 3 makes clear, her emails raised a group complaint about the Respondent's application of an employment policy that adversely affected her and her coworkers and sought a resolution that would have benefited them. The Respondent was well

---

[1] Subsequently, the Respondent filed five letters calling the Board's attention to recently issued case authority. We have accepted the Respondent's submissions pursuant to *Reliant Energy*, 339 NLRB 66 (2003). We have also accepted one letter in response from the General Counsel and another letter in response from the Charging Party.

[2] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

In the absence of exceptions, we adopt the judge's dismissal of the allegation that the Respondent violated Sec. 8(a)(1) by maintaining a handbook rule prohibiting employees from "[l]eaving the Company or assigned work place" without permission. There was no allegation that a separate handbook rule prohibiting employees from "[w]alking off the job during working hours" was unlawful.

[3] We have amended the remedy and modified the judge's recommended Order to conform to our findings and to provide for the posting of the notice in accord with *J. Picini Flooring*, 356 NLRB No. 9 (2010). In addition, we shall order the Respondent to compensate the discriminatee for the adverse tax consequences, if any, of receiving a lump-sum backpay award and to file a report with the Social Security Administration allocating the backpay awards to the appropriate calendar quarters. We shall substitute a new notice to conform to the Order as modified and in accordance with our decision in *Durham School Services*, 360 NLRB No. 85 (2014).

[4] No exceptions were filed to the judge's finding that Kish's emails did not lose the protection of the Act under *Atlantic Steel Co.*, 245 NLRB 814 (1979). Thus, the warning animus even if, as the Respondent claims, it was offended only by the tone, and not the content, of the emails.

The judge made no finding that Kish engaged in protected concerted activity at a disciplinary meeting on February 10, 2011. For that reason, we agree with the judge that an *Atlantic Steel* analysis of Kish's behavior at that meeting is not necessary. In any event, Kish's conduct at the February 10 meeting is not determinative, as the Respondent did not show that it would have discharged her for that conduct alone if she had not also engaged in her earlier protected activity.

The judge further found that the Respondent could not argue, as it did in its posthearing brief, that it discharged Kish in the honest belief that she had engaged in misconduct under *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964). We agree with the judge that the *Burnup & Sims* framework is not well suited to answer the question presented here. Under *Burnup & Sims*, an employer violates Sec. 8(a)(1) by disciplining an employee based on a good-faith but mistaken belief that the employee committed misconduct while engaged in protected activity. Thus, assuming good faith, the issue under *Burnup & Sims* is whether the employer made a mistake as to the occurrence of the alleged misconduct. There is no evidence of a good-faith mistake here. The Respondent knew precisely what actions Kish had taken, and those actions were protected.

[5] We do not, however, rely on the judge's statement that Kish's activity would be protected even if the Respondent's managers honestly believed that Kish was acting alone. Board precedent, which no party asks us to revisit, holds that an employer must know or believe that an employee's actions are of a concerted nature to establish a violation of Sec. 8(a)(1) of the Act. See *Reynolds Electric, Inc.*, 342 NLRB 156, 156 (2004) (finding no violation where there was no evidence that the employer knew that the employee was acting for others as well as for himself).

2                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

aware that Kish's emails addressed an issue of general concern to its work force. Its Vice President of Human Resources Joni Kovak acknowledged that the recently implemented IWD policy triggered numerous questions among both employees and managers as "a lot of people were confused"—a sentiment echoed by Compensation and Benefits Analyst Kate Morlock. According to Kovak, "[I]t took us a little time to hammer out all the issues," including discussions among various human resources officials and "all the senior management team." More specifically, on the day before Kish's emails, Collections Supervisor Mary Neclerio, still confused about the policy, contacted the Respondent's human resources office with questions about the policy's application to four listed employees, including herself, Kish, and Kish's coworkers, Diane Cocchia and Sandra Gaetano. Neclerio's email clearly placed the Respondent on notice that these workers—not just Kish—were directly affected by the specific concerns that Kish raised in her emails.

Kish herself referred to others in her emails and in her meetings with the Respondent. Her first email explained that she thought the IWD policy "should have been explained to *us* earlier than after the fact"—indicating that her complaint was a group one; and her subsequent email asked that "*we* be comped the 3-1/2 hours"—unequivocally requesting a satisfactory resolution for her and her coworkers. These plural pronouns referred to Cocchia and Gaetano, both of whom were similarly situated with her, as Neclerio's recent email had made clear.[6]

Then, in two separate meetings, Kish specifically brought up coworkers Cocchia and Gaetano by name in attempting to explain why she sent the emails. In both instances, the Respondent denied Kish the opportunity to even finish her sentence, although she did specifically name both workers in both meetings. First, on February 4, 2011, Kish approached Vice President Chris Petersen in an attempt to discuss the emails with him. As Kish credibly testified, when she "was trying to explain to him that Diane and Sandra thought the same" as she did about the Respondent's implementation of the IWD policy, Petersen cut her off, stating that she should never have talked to human resources in the fashion in which she did. Then, in a disciplinary meeting on February 10 with Kovak, Petersen, and Neclerio, Kish again attempted to

raise her coworkers' concerns about the policy. According to Kish's credited testimony: "I said Diane and Sandra thought—I started to explain myself . . . . And [Kovak] said you brought this on yourself. No one had a problem with this except for you." Kish had no further opportunity to clarify that her coworkers shared her concerns because "then Chris chimed in and he was yelling at me again why don't you admit you're wrong?"[7]

Contrary to our dissenting colleague, we do not find it surprising that Kish did not attempt again to explain that other employees shared her concerns, given the Respondent's hostile and dismissive reaction to Kish's attempts to explain why she sent the emails. Nor do we share his willingness to accept Kovak's response to Kish ("No one had a problem with this except for you.") as establishing that Kovak believed Kish alone was concerned about the Respondent's new IWD policy. On the contrary, Kovak's statement was disingenuous, at best, as she was well aware that other employees had repeatedly articulated concerns about the IWD policy. One of her own supervisors had described it as a "nightmare." And, contrary to our colleague's view, whether those employees "agreed with Kish's complaint" is irrelevant. See *El Gran Combo*, 284 NLRB 1115, 1117 (1987), enfd. 853 F.2d 996 (1st Cir. 1988).

In sum, the record here amply demonstrates that the Respondent knew that Kish was acting not only on her own behalf, but also in concert with and in support of her coworkers to resolve a common concern. See *Manimark Corp.*, 307 NLRB 1059, 1059 (1992) (knowledge shown where employee was airing previously discussed complaints about working conditions and employer had "reason to believe" that employee was not acting alone), enf. denied on other grounds 7 F.3d 547 (6th Cir. 1993).

2. At all relevant times, the Respondent maintained a rule prohibiting employees from engaging in "[i]nappropriate behavior while on Company property." The judge found that the Respondent's rule was unlawful as written because employees would reasonably construe the rule to prohibit Section 7 activity.

In determining whether an employer's maintenance of a work rule reasonably tends to chill employees in the exercise of their Section 7 rights, the Board gives the rule a reasonable reading and refrains from reading particular phrases in isolation. *Lutheran Heritage Village-Livonia*,

---

[6] See *Jim Causley Pontiac v. NLRB*, 722 F.2d 322, 323 (6th Cir. 1983)("The use of the term 'we' [in the employee's Occupational Safety and Health Act (OSHA) complaint] clearly indicated to the petitioner that at least two employees were involved. Although there is no direct evidence of actual knowledge in the record, the facts which the general counsel proved, including but not limited to the context within which the []OSHA complaint was filed, were sufficient to justify the Board's conclusion."), enfg. 263 NLRB 942 (1982).

[7] The judge inferred that, in cutting Kish off, Kovak sought to avoid having a discussion that she knew implicated the National Labor Relations Act. At a minimum, Kovak's response reflects her awareness that Kish was seeking to raise a concern that fellow employees shared. Her sharp reaction to that effort—abruptly rejecting Kish's claim and insisting that Kish was somehow to blame—certainly suggests hostility toward any further attempt by Kish to instigate group activity regarding this group concern.

343 NLRB 646, 646 (2004). Where, as here, a rule does not explicitly restrict activities protected by Section 7, the rule is not unlawful unless (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights. Id. at 647.

We agree that the Respondent's rule prohibiting "inappropriate behavior" is unlawful. Unlike the judge, however, we find it unnecessary to determine whether the rule is facially overbroad because we find, in any event, that the Respondent applied the rule to restrict Kish's exercise of her Section 7 rights.[8]

As discussed, Kish engaged in protected concerted activity when she emailed the Respondent's supervisors/agents on February 3. Based on those emails, the Respondent issued Kish a final written warning.[9] Although the warning did not expressly cite the "inappropriate behavior" rule, the warning characterized Kish's emails as "disrespectful" and "rude," reminded Kish that this was not her first warning for using "inappropriate/profane" language, and instructed her to address all employees "with respect" in the future.[10] Believing that Kish would not change her "inappropriate" behavior, the Respondent subsequently discharged her. Those circumstances plainly support a finding that the Respondent's condemnation of Kish's protected conduct was grounded in the rule barring "inappropriate behavior."

That finding is further supported by the testimony of the Respondent's witnesses at the hearing. The Respondent admitted that the rule was "broad" and, when asked whether the Respondent enforced the rule, Vice President of Human Resources Joni Kovak testified that "whatever we deem inappropriate is dealt with." Specifically, with respect to Kish, Kovak also testified that the Respondent felt that it had to issue Kish the written warning for her "inappropriate behavior" to prevent it from happening again. The Respondent's other witnesses, moreover, repeatedly used the word "inappropriate"

to describe Kish's emails, further indicating that the Respondent interpreted Kish's actions as falling squarely within the terms of the rule. Last, none of the Respondent's witnesses denied that the Respondent viewed Kish's protected conduct as inappropriate or that it reached that conclusion under the rule.[11]

Accordingly, we find that the Respondent applied its "inappropriate behavior" to restrict activity protected by Section 7 of the Act, rendering the rule unlawful.[12]

### AMENDED REMEDY

Regarding the unlawful rule, we shall modify the judge's recommended Order in accordance with *Guardsmark, LLC,* 344 NLRB 809, 812 (2005), enfd. in relevant part 475 F.3d 369 (D.C. Cir. 2007). Pursuant to *Guardsmark,* the Respondent may comply with the Order by rescinding the unlawful provision and republishing its employee handbook without it. We recognize, however, that republishing the handbook could be costly. Accordingly, the Respondent may supply the employees either with a handbook insert stating that the unlawful rule has been rescinded, or with a new and lawfully worded rule on adhesive backing that will cover the unlawfully broad rule, until it republishes the handbook either without the unlawful provision or with a lawfully-worded rule in its stead. Any copies of the handbook that are printed with the unlawful rule must include the insert before being distributed to employees. See *2 Sisters Food Group,* 357 NLRB No. 168, slip op. at 8 fn. 32 (2011); *Guardsmark,* supra at 812 fn. 8.

### ORDER

The National Labor Relations Board orders that the Respondent, Hitachi Capital America Corp., Norwalk, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining or enforcing a work rule that prohibits "[i]nappropriate behavior while on Company property."

(b) Discharging employees because they engage in protected concerted activities.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

---

[8] Because we find it unnecessary to pass on whether the rule is facially unlawful, we do not respond to our dissenting colleague's discussion of this issue, but we note the Board's decision in *First Transit, Inc.,* 360 NLRB No. 72 (2014) (finding rule prohibiting "inappropriate attitude or behavior" unlawful on its face).

[9] There is no allegation that the issuance of the warning itself was an unfair labor practice.

[10] As the judge found, Kovak sent an email containing the draft of Kish's final written warning on February 10 to other supervisors. The filename of the document attached to that email was "Written Warning—V. Kish—inapp. behavior 2 8 2011.doc." Kovak acknowledged that "inapp." was an abbreviation of "inappropriate." Chris Petersen, vice president of collections and asset management, testified that he told Kish on February 4 that he felt the tone of her emails was "inappropriate."

[11] To point out the absence of countervailing evidence on this issue is not to place the burden of proof on the Respondent, as our dissenting colleague argues.

[12] We find it unnecessary, however, to pass on the judge's finding that Kish was discharged pursuant to the rule, as such a finding would not materially affect the remedy.

4    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(a) Within 14 days of the date of this Order, revise or rescind the rule prohibiting "[i]nappropriate behavior while on Company property."

(b) Furnish all current employees with inserts for the current employee handbook that (1) advise that the unlawful rule has been rescinded, or (2) provide the language of a lawful rule; or publish and distribute revised handbooks that (1) do not contain the unlawful rule, or (2) provide the language of a lawful rule.

(c) Within 14 days from the date of this Order, offer Virginia Kish full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(d) Make Virginia Kish whole for any loss of earnings and other benefits resulting from her discharge, in the manner set forth in the remedy section of the judge's decision, less any net interim earnings, plus interest.

(e) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge of Virginia Kish and within 3 days thereafter notify Kish in writing that this has been done and that the discharge will not be used against her in any way.

(f) Compensate Virginia Kish for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file a report with the Social Security Administration allocating the backpay award to the appropriate calendar quarters.

(g) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(h) Within 14 days after service by the Region, post at its Norwalk, Connecticut facility copies of the attached notice marked "Appendix."[13]  Copies of the notice, on forms provided by the Regional Director for Region 34, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such

as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 10, 2011.

(i) Within 21 days after service by the Region, file with the Regional Director for Region 34 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  August 8, 2014

_____
Kent Y. Hirozawa,                          Member

_____
Nancy Schiffer,                            Member

(SEAL)          NATIONAL LABOR RELATIONS BOARD

MEMBER MISCIMARRA, dissenting.

Unlike my colleagues, I would dismiss the complaint's allegations that the Respondent violated Section 8(a)(1) of the Act by discharging employee Virginia Kish and by applying a handbook rule prohibiting "inappropriate behavior on Company property" to restrict Kish's protected concerted activities.  As to the discharge, I believe the General Counsel failed to prove that the Respondent knew that Kish's conduct was concerted.  As to the rule, in my view, the evidence fails to establish that the Respondent applied its "inappropriate behavior" rule when it disciplined Kish.

*A. Kish's Discharge*

As an initial matter, I agree with the majority that Kish was engaged in protected concerted activity when, after discussing the Respondent's Inclement Weather Day policy (IWD policy) with coworker Diane Cocchia, Kish complained to management, via several email messages dated February 3, 2011, about the Respondent's calculation of compensatory time and management's failure to clearly explain its IWD policy beforehand.  The evidence shows that Cocchia shared Kish's concerns about the calculation of compensatory time under the IWD policy.

---

[13] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

Thus, Kish's February 3 emails were concerted activity because they brought a group complaint to the attention of management. See *Meyers Industries,* 281 NLRB 882, 887 (1986), affd. sub nom. *Prill v. NLRB,* 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988).

However, contrary to the majority, I would find that the General Counsel failed to prove that the Respondent knew that Kish's email complaints were concerted when it discharged her. "It is well settled that Section 8(a)(1) of the Act is violated only if at the time of the discharge the employer had knowledge of the concerted nature of the activity for which the employee was discharged." *Walter Brucker & Co.,* 273 NLRB 1306, 1307 (1984). Further, the issue is whether the decisionmaker *knew* the activity was concerted, "not whether the decisionmaker should or reasonably could have known." *Reynolds Electric, Inc.,* 342 NLRB 156, 157 (2004).

It is undisputed that the Respondent was unaware of the brief discussion between Kish and Cocchia that preceded Kish's email complaints. Kish was the only person who complained to the Respondent about its calculation of compensatory time under the IWD policy.[1] Kish never informed the Respondent that she was relaying the shared concerns of a group of employees, or of herself and Cocchia. Her emails do not reference any other employees, and she did not "cc" any coworker on the emails. Moreover, Kish's emails are replete with references to *her own* dissatisfaction with how the Respondent had treated *her.* The word "I" appears no less than 26 times in the course of her four short emails. Thus, for all the Respondent knew from reading those emails, which the judge correctly found were "ill mannered, and perhaps more," Kish had acted alone. In addition, all of the Respondent's decisionmakers testified without contradiction that they understood Kish to have acted alone, not on behalf of other employees.[2]

Despite those compelling facts and the decisionmakers' uncontradicted testimony, the judge *inferred* that the Respondent's managers knew that

Kish's complaints were acts taken in concert with other employees. She drew that inference from "[Collections Manager Mary] Neclerio's initial email, Kish's use of collective pronouns in her emails, her references to other employees in meetings with managerial personnel as well as by Morlock and Kovak's admissions that a number of other employees were confused about the IWD policy." I believe these facts do not reasonably warrant the judge's inference.

Neclerio's initial email, sent to other managers, *preceded Kish's complaints.* In it, Neclerio noted that three employees had put in for more than 3 hours of compensatory time and queried whether they could receive more than 2 hours (i.e., whether compensatory time would be granted for hours worked before the Respondent's facility officially opened at 9 a.m.). To be sure, Neclerio's email reflects her understanding that the compensatory time issue affected several employees. But it cannot establish that Neclerio knew that Kish's *subsequent* email complaints were actions taken in concert with coworkers. *Reynolds Electric,* 342 NLRB at 156 (finding that the General Counsel failed to prove employer knew that employee's complaint about prevailing wages was concerted merely because wages were a central issue affecting all employees, the issue was common knowledge among employees, and they all stood to benefit). For this same reason, Morlock's and Kovak's admissions that certain additional employees had been confused about *other* aspects of the IWD policy do not warrant an inference that the Respondent knew that Kish had lodged *her* complaints about calculation of compensatory time on behalf of a group.

Further, it is not reasonable to infer that the Respondent knew that Kish's February 3 email complaints were concerted from the fact that Kish very briefly made reference to two coworkers in a conversation with Vice President Peterson on February 4 and in a disciplinary meeting on February 10. Neither of Kish's statements amounted to anything more than the mention of her coworkers' names. Additionally, at the February 10 disciplinary meeting, Vice President of Human Resources Kovak explicitly stated to Kish that "no one had a problem with this except you," and Kish never attempted to clarify that other workers shared her concerns.[3] This

---

[1] Several unidentified employees had earlier asked the Respondent unrelated questions about other aspects of the IWD policy. Specifically, several employees asked Compensation & Benefits Analyst Kate Morlock how the IWD policy applies to part-time employees, and another employee requested the reinstatement of a previously scheduled vacation day. None of those employees complained about compensatory time under the IWD policy or criticized the Respondent for having failed to adequately explain the IWD policy. Thus, Kish's February 3 email complaints were not actions taken in concert with these other employees, and there was no reason for the Respondent to think that they were.

[2] Tr. 233–234, 254 (Kate Morlock, compensation & benefits analyst); Tr. 277–278 (Joni Kovak, vice president of human resources); Tr. 320 (Chris Peterson, vice president of collections and asset management).

[3] I disagree with my colleagues' contention that Kish "had no further opportunity" to clarify that others shared her concerns because Peterson promptly "chimed in" after Kovak spoke. By Kish's own account, Kish effectively told Peterson to be quiet, saying, "Please, Joni [Kovak] is speaking to me." If Kish could say that, she could have picked up the thread of her earlier reference to her coworkers. Moreover, after the meeting ended, Kish sent Kovak an email. She could have clarified her point then as well, but did not. The majority finds Kish's inaction unsurprising. I do not take a position on that issue because I find it to

6                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

statement reinforces the other evidence suggesting that the Respondent lacked knowledge that Kish was acting in concert with "other employees" regarding the "problem" being discussed. In any event, nothing in Kish's statements to managers on February 4 and 10 informed the Respondent that Kish had consulted Cocchia or any other coworkers in the short time between when Kish learned that she would receive only 2 hours of compensatory time and when she sent her emails, rather than after she had sent them. Thus, the Respondent had no reason to conclude, based on the allusions to coworkers during the February 4 and 10 conversations, that Kish's February 3 emails constituted concerted acts.

Finally, I disagree with the judge's reliance on two collective pronouns ("us" and "we") in Kish's February 3 emails to infer that the Respondent knew that Kish was relaying a group complaint based on interactions with her coworkers. Here are the key passages in Kish's emails:

- **I think** that this [i.e., the limitation on compensatory time] should have been explained to us earlier than after the fact. [Emphasis added.]

- **I feel** we should be comped the 3 ½ hours and if this is not the procedure going forward **I would understand**, but right now **I do not agree** with it being told to me after the fact. [Emphasis added.]

In both passages Kish communicates what *she* thinks and feels. She does not imply, much less make clear, that she is acting in concert with her coworkers. Without more, the passing use of the terms "we" or "us" does not reasonably support an inference of concerted activity by or on behalf of multiple employees when the same expressions could just as plausibly have been used by an individual employee who

was pursuing an individual complaint and acting exclusively on his or her own behalf.[4]

For the reasons given above, the General Counsel failed to prove that the Respondent knew that Kish's February 3 email complaints constituted concerted activities. The evidence is entirely consistent with the uncontradicted testimony of the Respondent's decisionmakers that they believed that Kish had spoken for herself only, in a disrespectful tone, and that it took action against her because of that tone, not because of any known group activity. Consequently, I would dismiss the complaint's allegation that the Respondent unlawfully discharged Kish.[5]

### B. The Handbook Rule Prohibiting "Inappropriate Behavior on Company Property"

The Respondent's rule against "inappropriate behavior on Company property," which appears in section 2.3 of the employee handbook, is clearly lawful on its face.[6]

---

[4] Although the majority relies on *Jim Causley Pontiac v. NLRB*, 722 F.2d 322, 323 (6th Cir. 1983), to support its finding that the Respondent knew that Kish was engaged in concerted activities because she used two plural pronouns in her emails, *Jim Causley Pontiac* is distinguishable from the instant case. There, "several employees," at least three, had complained to management about hazardous paint fumes after a complaint was filed with a State health agency. Further, "the [State health agency's] letter on its face revealed that employee complaints about paint fumes had emanated from two non-managerial positions instead of just one." Id. In that context, the court concluded that language in the complaint stating, "[W]e are having headaches every day from working there" tended to support the Board's finding that the employer knew the complaint was concerted. Here, Kish was the only employee who had complained about the limit on compensatory time under the IWD policy, and Kish's emails do not on their face reveal that her criticism emanated from more than a single employee. On the contrary, the two passing uses of a plural pronoun are drowned by an ocean of singular pronouns.

[5] *Manimark Corp.*, which my colleagues cite in support of their finding that the Respondent knew that Kish's email complaints were concerted, is distinguishable from this case. See *Manimark Corp.*, 307 NLRB 1059 (1992), enf. denied on other grounds 7 F.3d 547 (6th Cir. 1993). The employer in *Manimark* discharged an employee, Fields, for complaining about employment conditions on two occasions. On the first occasion, Fields told a manager that "he and other drivers were unhappy" about several specified workplace issues, id. at 1061–1062, and the employer's discharge letter mentioned that "you said you had some complaints as did another driver you knew of," id. at 1060. On the second, Fields complained about unpaid sick leave, and one of Fields' coworkers "actively participated" in that protest. Id. at 1059. On those facts, the Board found that the respondent had knowledge of the concertedness of Fields' two complaints. Here, in contrast, Kish never informed the Respondent that other employees shared her concern, nor did any of Kish's coworkers "actively participate" in any protest.

[6] See, e.g., *Ark Las Vegas Restaurant Corp.*, 335 NLRB 1284, 1284 fn. 2, 1292–1293 (2001) (finding lawful a rule prohibiting "any conduct, on or off duty, that tends to bring discredit to, or reflects adversely on, yourself, fellow associates, the Company, or its guests . . . ."), enfd. in part, remanded on other grounds 334 F.3d 99 (D.C. Cir. 2003), on remand 343 NLRB 1281 (2004); *Flamingo Hilton-Laughlin*, 330

---

be irrelevant. The important fact is that Kish said nothing during the February 10 meeting to put the Respondent on actual notice that her February 3 email complaints were concerted actions.

My colleagues properly decline to adopt the judge's inference that when Kovak told Kish "no one has a problem with this except you," she was seeking to avoid having a discussion that she knew implicated the Act. Nonetheless, in reference to this statement, they speculate that "Kovak's response reflects her awareness that Kish was seeking to raise a concern that fellow employees shared." I respectfully disagree with my colleagues' interpretation of this statement by Kovak. On its face, the statement conveys the sentiment that Kish alone, and nobody else, "had a problem" with the way compensatory time was calculated under the IWD policy. That other employees had asked management about other aspects of the IWD policy does not establish that Kovak was being disingenuous when she stated that Kish was the only employee who had a problem with how compensatory time was calculated. In sum, nothing in Kovak's statement or the record supports a conclusion that the statement meant the opposite of what it conveyed, nor is there other evidence that reasonably establishes Kovak believed that Kish's February 3 email complaints, stocked with singular pronouns, were the product of discussions between Kish and her coworkers.

HITACHI CAPITAL AMERICA CORP.    7

Unlike my colleagues, who find it unnecessary to pass on the rule's facial validity, I would reverse the judge and dismiss the complaint's allegation that the Respondent violated Section 8(a)(1) of the Act by merely maintaining the rule.

Furthermore, I disagree with the majority's separate finding that the Respondent acted unlawfully by allegedly applying rule 2.3 when disciplining Kish for sending her February 3 emails.[7] There is no evidence that the Respondent invoked that rule when it disciplined Kish. The majority concedes as much, but nevertheless finds that her discipline must have been "grounded in" rule 2.3 because Kish's written warning stated that she had previously been warned for "inappropriate/profane" language, the Respondent's witnesses testified at the hearing that they found the tone of her February 3 emails "inappropriate," and none of those witnesses denied reaching that finding under rule 2.3. I respectfully disagree.

The term "inappropriate" is a generic and common descriptor of conduct that employers, employees, and others regard as unsuitable for the workplace. The fact that the written warning used that generic word, among others ("disrespectful," "aggressive," "rude"), to characterize Kish's behavior does not establish that the Respondent actually applied rule 2.3 to Kish.

More importantly, contemporaneous documentation indicates that the Respondent actually applied a different handbook rule. After she was discharged, Kish applied for State unemployment compensation benefits. In its responsive filings, the Respondent explained that Kish had repeatedly violated employee handbook rule 8.1, entitled "Performance Management." Rule 8.1 prohibits a host of behaviors, including "using abusive or foul language" and "insubordination." In its filing, the Respondent further explained that Kish had been "disrespectful" and "insubordinate" on several occasions, including in her February 3 emails, which conduct ultimately culminated in her discharge. Thus, the documentary evidence indicates that Kish was disciplined and later discharged under rule 8.1, not rule 2.3.

Finally, I disagree with my colleagues to the extent they rely in part on the failure of the Respondent's wit-

nesses to deny at the hearing that they had applied rule 2.3 to Kish. The majority errs here by essentially reversing the burden of proof. The burden is on the General Counsel to prove that the Respondent applied rule 2.3 to restrict Section 7 activity, not on the Respondent to prove it did not. For the reasons stated above, I believe the General Counsel did not satisfy his burden to establish this violation.

Accordingly, I respectfully dissent.

Dated, Washington, D.C.   August 8, 2014

_____
Philip A. Miscimarra,                    Member

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain or enforce a work rule that prohibits "inappropriate behavior while on Company property."

WE WILL NOT discharge you for engaging in protected concerted activities.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, within 14 days from the date of the Board's order, revise or rescind the rule prohibiting "inappropriate behavior while on Company property."

WE WILL furnish you with inserts for the current employee handbook that (1) advise that the unlawful rule has been rescinded, or (2) provide the language of a lawful rule; or publish and distribute revised handbooks that (1) do not contain the unlawful rule, or (2) provide the language of a lawful rule.

---

NLRB 287, 288 (1999) (finding lawful a rule prohibiting "off-duty misconduct that materially and adversely affects job performance or tends to bring discredit to the Hotel"). Although not passing on the facial validity of the rule, my colleagues note the Board's decision in *First Transit, Inc.*, 360 NLRB No. 72 (2014). There, a Board majority found facially unlawful a rule prohibiting "[d]iscourteous or inappropriate attitude or behavior to passengers, other employees, or members of the public." Member Johnson relevantly dissented. 360 NLRB No. 72, slip op. at 3 fn. 8. I agree with his dissent.

[7] As explained above, I agree with the majority's finding that Kish's February 3 email complaints constituted protected concerted activities.

8                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

WE WILL, within 14 days from the date of the Board's order, offer Virginia Kish full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Virginia Kish whole for any loss of earnings and other benefits resulting from her discharge, less any net interim earnings, plus interest.

WE WILL compensate Virginia Kish for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file a report with the Social Security Administration allocating the backpay award to the appropriate calendar quarters.

WE WILL, within 14 days from the date of the Board's order, remove from our files any reference to the unlawful discharge of Virginia Kish, and WE WILL, within 3 days thereafter, notify her in writing that this has been done and that the discharge will not be used against her in any way.

HITACHI CAPITAL AMERICA CORP.

The Board's decision can be found at http://www.nlrb.gov/case/34-CA-013011 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1099 14th Street, N.W., Washington, D.C. 20570, or by calling (202) 273-1940.



*Thomas E. Quigley* and *Sheldon A. Smith, Esqs.,* for the Acting General Counsel.
*Lawrence Peikes, Esq. (Wiggin and Dana, LLP),* of Stamford, Connecticut, for the Respondent.

DECISION

STATEMENT OF THE CASE

MINDY E. LANDOW, Administrative Law Judge. Pursuant to a charge and amended charge filed by Virginia Kish, an individual, on June 13, and August 12, 2011, respectively[1]  the Regional Director for Region 34 issued complaint and notice of hearing (the complaint) on October 13. The complaint alleges that Hitachi Capital America Corp. (HCA or Respondent) violated Section 8(a)(1) of the National Labor Relations Act (the Act) by discharging Kish because of her concerted protected

activities and, alternatively, pursuant to an overly broad work rule. The complaint additionally alleges that Respondent maintains another overly broad work rule, unrelated to Kish's discharge, which violates the Act by its mere maintenance. Respondent filed an answer denying the material allegations of the complaint. A hearing was held before me on January 24 and 25, 2012, in Hartford, Connecticut.

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the counsel for the Acting General Counsel[2] and the Respondent, I make the following

FINDINGS OF FACT

I. JURISDICTION

Respondent is a wholly owned subsidiary of Hitachi Capital Corporation and operates a facility located in Norwalk, Connecticut where it is engaged in the business of providing financing to commercial enterprises. During the 12-month period ending September 30, in conducting its operations, Respondent purchased and received at its Norwalk facility goods valued in excess of $50,000 directly from points located outside the state of Connecticut. Respondent admits and I find that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

II. ALLEGED UNFAIR LABOR PRACTICES

1. Respondent's operations and Kish's employment history

Respondent employs approximately 80 people at its Norwalk facility.  For the purposes of the instant matter, the relevant administrators and members of Respondent's personnel are: Ryan Collison, senior vice president and chief financial officer; Russell Baim, vice president of "small ticket operations credit"; Chris Petersen, vice president of "collections and asset management"; Siobhan (Joni) Kovak, vice president of human resources; Mary Neclerio, collections manager; and Kate Morlock, compensation and benefits analyst. Morlock, who testified that she performs general human resources duties, reports directly to Kovak. She is an admitted agent of Respondent but there is no evidence that she functions in a supervisory or managerial capacity. Since October 2009, Petersen has overseen the operations within the collections department, where Neclerio supervises approximately 10 or 11 collections agents.

Charging Party Virginia Kish began working for Respondent in 2004 as a data entry specialist and, in March 2006, was then promoted to the position of collection specialist. In this capacity, she reported to Neclerio during all times relevant to this matter. Kish's primary responsibility was to make telephone calls to customers concerning their accounts, generally to convince them to remit payment on outstanding debt. Kish testified, without contradiction, that she typically worked about 50 hours per week and made between 40 and 50 calls per day. Petersen testified that Kish had a good work ethic. On April 16, 2010, on the occasion of Kish's 6th anniversary with HCA, Petersen sent her an email stating that he appreciated her hard work and effort.

---

[1] All dates are in 2011, unless otherwise indicated.

[2] Hereafter referred to as the General Counsel.

Respondent maintains "core" office hours between 9 a.m. to 5 p.m., although from Kish's testimony it is apparent that employees are allowed to, and do, work outside such hours. Kish typically reported to work at about 7:30 a.m. and would at times work until 5 or 6 p.m. to earn overtime. Prior to the establishment of an "inclement work day" (IWD) policy, described below, employees were also able to earn compensatory time off on three holidays per year, should they work on those designated holidays.

### 2. The implementation of the IWD policy

The winter season of 2011 was expected to be severe and in response to such predictions various members of Respondent's management, including Kovak and Peterson, developed an inclement weather day (IWD) policy for employees. Employees were instructed to telephone a designated number in the early morning when inclement weather occurred, or was expected to occur, and a recording would advise them whether the office would be open for the day. In general, if employees chose to come to work when the office was officially closed, they would receive their hourly pay as well as compensatory time (comptime) which could be taken at a later date. As will be discussed in further detail below, certain permutations of the IWD policy were not initially addressed prior to its implementation, leading to some confusion and questions among Respondent's work force.

The policy as initially announced in December 2010 was (in relevant part) as follows:

> If management declares an "Inclement Weather Day" (IWD) the following policy applies:
>
> If you are comfortable traveling and are able to report to the office you will be provided comparable time off at a later date. For example if you work a day during an IWD you will get a day off at a later date. Scheduling of any compensatory time off will follow the HCA standard time off request process. . . .
>
> If an IWD develops during the workday, employees will be paid for the entire day, regardless of whether they elect to remain at work or will leave the office. In such circumstances, Hitachi Capital America will abide by the same basic premise of appropriately compensating employees who stay after an IWD is declared for the hours they worked as determined by management in its sole discretion.

At a later date, in about early January 2011, a somewhat revised version of this policy was disseminated to employees which replaced the first paragraph quoted above with the following language:

> If you are comfortable travelling and are able to report to the office you will be provided additional time off at a later date. Scheduling of any compensatory time off will follow the HCA standard time off request.[3]

---

[3] Both Kovak and Morlock testified that, under this policy, if the office was officially closed, any employee who reported to work would receive their pay for the hours worked in addition to compensatory time (or paid time off) for a full 7 hours.

On January 12, 2011,[4] a major snowstorm blanketed the area and Kish called the IWD hotline. She was advised that the office was closed. Nevertheless, she reported to work that day and was paid for her time and awarded 7 hours of comptime. As it happened, Peterson asked Kish to work in a different department on that occasion because she was the only employee at the facility who had competency in that area. She, and the two other employees who reported to work on that day, received an email from Vice President Baim thanking them for a "wonderful job under very trying circumstances."

### 3. The events of early-February 2011

As Morlock testified, the IWD policy was implemented shortly after its announcement because bad weather was expected. Employees and their managers "definitely" had questions about it. The record reflects that Morlock and Kovak fielded questions regarding certain ambiguities in the policy's application in certain circumstances. It is one of these ambiguities which created the situation confronting Kish, as well as two of her coworkers.

On February 2, the Norwalk area again suffered severe weather. On that day, Kish called the hotline at about 7 a.m. and learned that the office would have a delayed opening and would open officially at 11 a.m. Nevertheless, Kish reported to work at her usual time of 7:30 a.m. and expected to receive comptime for the period prior to the official opening of the office. When she arrived, two other collections agents, Diane Cocchia and Sandra Gaetano, were there as well and the three employees discussed the fact that they would be receiving comptime under the newly implemented policy.

Apparently, Collections Supervisor Neclerio[5] did not share their understanding, however, because later that day she sent an email to Kovak and Morlock regarding departmental attendance on February 2, listing six employees who had taken vacation days and three other nonsupervisory employees who had accrued comp time for working "IWD" time as follows:

> Diane—3.45
> Virginia—3:30
> Sandy—3.30
> Mary (Me)— 2:00

Neclerio asked to be advised whether these employees would "get over the two hours." The following morning at about 8 a.m. Morlock responded that, "[a]nyone that [came] in prior to 11 a.m. only gets 2 comp hours."

Shortly thereafter, Neclerio approached Kish and informed her that she would only be receiving 2 hours of comptime for the prior morning. Kish did not respond to Neclerio. She then approached Cocchia and asked her what was going on. Cocchia responded: "Don't even get me started. It's bullshit. . . . I think Kate told Mary and Mary told us." Kish then told Cocchia, "I'm going to ask." Kish then returned to her desk and composed an email addressed to Morlock, with copies to Kovak and Petersen. This was the beginning of an email exchange which ultimately led Respondent to issue a written warning to Kish.

---

[4] All dates hereafter are in 2011, unless otherwise indicated.

[5] Neclerio did not testify in these proceedings.

10                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

The email exchange, which commenced at 9:15 a.m., is as fol-
lows:

Kate, Mary and Chris:

I usually come in to work at 7:30 and I came into work at 7:38
yesterday and worked a normal day. I did not know that IWD
days start at 9:00 or I would have not come in at that time. I
am not here to work for free, and to take risks to come to
work for nothing. I think this should have been explained to
us earlier than after the fact. I feel I should be paid this time
around and the next time an IWD day is declared, I will make
sure to be here at 9:00 no earlier unless requested.

Thank you,
Virginia Kish

Shortly thereafter, Morlock replied:

Hi Virginia,

I am not sure that I understand but you are being paid for the
time that you worked.

Thanks, Kate.

Kish's response is as follows:

I understand that I am being paid by the hour. I come into
work on IWD days all the time. I never come in at the delayed
hour that is my choice but I was under the assumption that if I
came in at the regular hours that I do work I would be comped
those hours worked. I was not told by my managers to come
in at 9:00 or you would not be given comp time for the first 1
1/2 or I would not have come in at the regular hour I would
have come in at 9:00. I feel we should be comped the 3 ½
hours and if this is not the procedure going forward I would
understand, but right now I do not agree with it being told to
me after the fact.

Thank you,
Virginia.

Morlock replied:

Hi Virginia,

To be quite honest, as a non-exempt employee, by law you
should not receive any comp time ever. I am copying Joni
Chris and Mary on this so that the issue can be opened up for
discussion as to how to proceed.

Kish responded:

Thank you, I would like to know just so I know how to pro-
ceed with coming to work going forward in the mornings on
an IWD day.

Morlock then forwarded the entire email stream to Kovak, Peter-
son and Neclerio with the following comment:

Hi Joni, Chris and Mary,

Please see Virginia's response below. This comp thing is a
nightmare! Let's discuss.

Thanks a lot!

Kate

The email Morlock sent to the other managers is dated Feb-
ruary 3 at 9:40 a.m. Thus, the entire email exchange set forth
above occurred during the course of approximately 25 minutes.
Kish did not receive a definitive response from Respondent
regarding the IWD policy until the morning of February 8,
when Morlock wrote as follows:

Hi Virginia,

Here is how the policy is being administered:

For a delayed opening—if you choose to come into work pri-
or to the official open time, you will receive comp time from
9 a.m. until the office opens. However, if you come in later
than 9 a.m. you will only receive comp time for the hours that
you worked. For example, if you come in at 10 a.m. but the
office is scheduled to open at 11 a.m. you will only get one
hour comp.

If you choose to remain working despite an early dismissal,
you will receive comp time from dismissal time through 5
p.m.

If you choose to come into work despite a full day closure,
you will receive 7 hours comp time.

Sorry for any confusion.

Thanks, Kate

Kish replied:

Thank you.

The record reflects that after the IWD policy was imple-
mented, several employees other than Kish as well as supervi-
sory personnel had questions about its various aspects. As
Morlock testified, three or four nonsupervisory employees ap-
proached her. One requested reinstatement of a vacation day
and others had questions as to how part-time employees would
be compensated for time they worked during an office closure.
Supervisors had questions about how to complete employee
timesheets. Morlock said because the policy was new, these
questions required her to investigate each individual circum-
stance and she would then respond to the employee in question
or their supervisor. When asked about her "nightmare" com-
ment, Morlock stated that she wrote that because the policy was
obviously confusing for both managers and employees and was
a challenge to administer. Kovak similarly testified that there
was confusion over the policy.

Respondent adduced considerable testimony from its wit-
nesses regarding their reactions to Kish's emails. Morlock testi-
fied that when she saw Kish's initial email she was definitely
"put off." She found it to be a "little accusatory and rude." She
felt that the manner in which Kish had addressed Neclerio and
Petersen was a "little inappropriate" and a "little insubordinate"
to Kish's managers. Morlock later testified that the tone was a
little aggressive, that she didn't think it appropriate and was a
little rough. Morlock testified that Kovak was upset with Kish's
tone. Kovak testified that she found Kish's emails to be aggres-
sive, disrespectful and rude. She stated that when she spoke
with Morlock about how inappropriate the emails were
Morlock told her that she had been "very much" offended by

them. Kovak later reiterated that she found the emails to be "unprofessional and inappropriate." She further testified that Petersen also found them offensive and Neclerio indicated to her that she found them offensive and inappropriate as well. Petersen testified that he considered the Kish emails to be insubordinate toward Morlock and that Kish had used language not appropriate for business communication. He stated that he found the emails to be inappropriate. In this regard, Peterson noted that he had previously instructed employees regarding email etiquette and guidelines but that he would have found them inappropriate regardless of such guidelines. He also stated that Neclerio felt the emails were inappropriate in tone.

In particular, when asked what she found disrespectful and rude about Kish's initial email, Kovak testified that:

> The whole idea—the whole section about I'm not here to work for free and to take risks to come to work for nothing. I think this should have been explained to us earlier than after the fact. I don't have an issue with the fact that she's questioning the policy, because a number of people had questions and asked for clarification. It's just the way she went about it.

> It's almost like saying I'm not getting paid for the time that I came in. I'm not here to work for free. Well, nobody works at Hitachi for free. So she was paid for the time she worked. And if she had worked beyond 40 hours she would have gotten time and a half.

> But the way she just attacks Kate for the lack of clarification, it's not Kate's fault. She didn't develop the policy, she didn't roll it out. I did, you know, in conjunction with the senior team. So she shouldn't be attacking Kate.

When asked about the second email, Kovak responded that she considered Kish to be placating and condescending to Morlock and overstated her working on IWD days since the policy had only been implemented the prior month. Kovak continued:

> I don't know where anybody gets an assumption that they would be given comp hours when our policy on our schedule has always been only three days a year that you get comp time, until this new policy came long. And it wasn't clear and I take responsibility for the fact that it wasn't clear. And I welcomed questions and I was glad people came with questions, but we didn't have everything ironed out. . . .

As noted above, Petersen testified that the tone of Kish's emails was offensive and unprofessional. On cross-examination, Petersen identified statements such as, "you know, things like I don't work for free, I'm not—you know just [] I don't' want to come to work for nothing. You know, just those types of comments, just generally in terms of what I was referring to." He added: "Well, we were referring to this whole thing as an email series, so it wasn't a specific email, date, time, you know, that sort of thing. We were referring to this email series."

In addition to discussions among the managers and Morlock regarding their dissatisfaction with Kish's emails, there were email communications among themselves and others. On February 3, at 2:55 p.m., Kovak sent the following email to Neclerio and Petersen:

> Chris & Mary: I just wanted to let you know that I've sent the information off to our attorney and that he is in court today and tomorrow. I expect to hear back from him on Monday. I will follow up with you then.

Later that day, at 4:45 p.m. Petersen responded to Kovak and Neclerio (with a copy going to Morlock):

> OK, thank you. I brought Ryan [Collison] in the loop as well and after considering all of the history with Virginia I support the termination action.

Notwithstanding the foregoing discussion of his "support" of the "termination action," Petersen testified that the decision to discharge Kish was not made until after a February 10 disciplinary meeting, which is discussed below. In this regard, Respondent adduced evidence that just before this disciplinary meeting was convened, Petersen approved Kish's requests to work on the President's Day holiday (February 21) and to take a personal day on February 15.

#### 4. Kish's February 4 discussion with Petersen

At the end of the workday on February 4, Kish approached Petersen in his office to see if he would support her in the comptime issue. When she raised the issue with Petersen, he stated that she was wrong to have spoken to Morlock in that fashion and that she had "disrespected" HR. As Kish testified, she started to mention "Sandra" but Petersen cut her off stating that she should never have talked to HR in that fashion. Kish recounted that Petersen continued to angrily remonstrate against her and she felt intimidated and distraught. In his testimony, Petersen stated that since he had not yet had an opportunity to speak with Kovak or Morlock directly about Kish's emails he did not know what they wanted to "do there." Petersen did not elaborate on what this might have meant. He told Kish that he "felt the tone of the email was inappropriate, that whether it be to Kate, a member of HR, or any other member of our staff peers, or any manager, that I felt that it was inappropriate and, you know that I basically left it where I needed to get Joni's thoughts, I wanted to confer with her and I told Ms. Kish that. And that was basically it." Petersen did not specifically deny that Kish mentioned any other employee during this discussion but, in response to guided questioning from Respondent's counsel, did assert that he did not understand her to be advocating for anyone but herself.[6]

#### 5. Kish's written warning

On the afternoon of February 8, Kovak emailed Petersen and Neclerio that:

> I have drafted the final warning for Virginia and sent it to the attorney for a final review. I hope to have his response by tomorrow morning.

Petersen testified that the decision to issue a written warning to Kish was based on the fact that, "we felt the communication

---

[6] Morlock testified similarly, but there is no evidence that she played any definitive role in the decision to discharge Kish.

12                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

was inappropriate and unprofessional and we wanted to make sure that Kish understood what we expected." Kovak testified that, because of a prior written warning issued in September 2010 (discussed below), management did not feel as though they could let this go. If they were to sweep such misconduct under the rug, it would resurface and there was a need to be consistent and proactive.

Shortly before 10 a.m. on February 10, Kovak emailed Petersen and Neclerio a copy of a "final written warning" for Kish. The email is captioned "Written Warning—V.Kish—Inapp. Behavior 2–8–2011.doc."[7]

The warning, addressed to Kish from Neclerio and Petersen, is as follows:

> In light of your recent actions, i.e. your disrespectful and aggressive behavior toward HCA employees and managers, you are receiving this final written warning. The following details the issues.
>
> In your email dated February 3rd, 2011 to Mary Neclerio, Chris Petersen and Kate Morlock, you exhibited disrespectful, rude behavior in addressing your concerns about clarity in HCA's new Inclement Weather Day ("IWD") policy. You are expected to address policy concerns proactively versus waiting until an issue occurs. Your problem, with the IWD late opening was entirely preventable by you. Blaming others for your lack of understanding is unacceptable.
>
> As you may recall, the issue of your using inappropriate/profane language and overly aggressive/rude behavior was also addressed with you in a written warning dated September 10, 2010, which you refused to sign. A copy of the 9/10/10 warning was provided to you, and is also in your permanent record in HR.
>
> Going forward, you will address all employees and customers with respect—in written and verbal communications. Failure to immediately address the issues as stated above may result in further disciplinary action up to and including termination.
>
> I trust that you will take whatever steps are necessary to address the areas identified. Please seek me out as needed with any questions or issued.

As Kish testified, at about 2:30 p.m. that day, Neclerio approached her and stated, "[W]e need to see you a moment." Kish's unrebutted testimony is that Neclerio also stated that she had nothing to do with this, and was not going to say anything. She brought Kish to Kovak's office, where Petersen and Kovak were waiting. As Kish testified, Kovak "giggled" and stated, "We meet again." She was holding a paper. Kish said that whatever the paper was she was not going to sign it and was going to consult her attorney. Kovak replied that that was the second time Kish had mentioned an attorney, characterized her comment as a "threat" and stated: "Don't think we didn't talk to our attorneys about you and what we're going to do to you." Kish replied that she had a right to speak with whomever she wanted and then stated: "Diane and Sandra thought . . ." but

Kovak interrupted her and stated: "No, you brought this on yourself—no one had a problem with this except for you." At that point Petersen interjected and asked Kish why she could not just admit that she was wrong. Both Kovak and Petersen were speaking at the same time, so Kish turned to him and said, "Please, Joni is speaking to me." At that point the room quieted down and Kish asked if they were finished. Kovak and Petersen exchanged looks and Kovak stated in a low voice, "We're finished." After some confusion and discussion about which copy should be given to Kish, Kovak then handed Kish the written warning along with copies of her emails and Kish left the room and returned to work. Kish acknowledged that at some point during the meeting she accused the managers of "harassment."

Kovak testified that the original warning was placed on the table in a place where Kish was to sit and once she was brought into the room, Petersen went through the warning line-by-line and talked about why they were there, asking Kish did any of it "resonate." During this process Kish became flustered and angry, stated that they were harassing her, that it wasn't fair, that she didn't agree with it, and would have to get an attorney involved. As Kovak testified, "And she said that several times and she was so exasperated and poor Chris was exasperated too, but he didn't know what to do because he thought that she'd be open-minded like she had been in the past." According to Kovak, the meeting ended in the following manner:

> And so he said—you know, he looked at her because she was rolling her eyes and making gestures and this is crazy, oh please, that sort of thing. When he said to her you're doing it right now, you're being disrespectful and rude right now, that's when she rolled her eyes and she said please, and she got up and walked out.

Petersen testified as follows:

> Well, Virginia arrived in the meeting. We asked her to take a seat. We had prepared the original for Virginia. That was placed in front of Virginia and I took the lead in communicating the written warning to Virginia.
>
> I basically just told her why we were giving the written warning in terms of the communication and then went into detail about—again how we need appropriate professional communication in the workplace and expressed that our expectation is that we always are professional as a team and as individuals and we basically went over everything in the write up.
>
> We—basically Virginia, after discussing the warning and its contents, she said that she refused to sign it, which she had done in the previous case. We again told her that was okay. She said that she wanted to talk to her attorney a few times and rolled her eyes. She was saying, you know, oh please type of thing and, you know, negative body language, you know, throwing her head back, rolling her eyes, that type of thing.
>
> And she was obviously—we were trying to calm her down. I know that Mary was, you know, actually asking her to calm down just in terms of the way she was reacting. You know, she ended the meeting by leaving and basically saying she wasn't going to sign it and walked out.

---

[7] Kovak acknowledged that the word "inapp" refers to "inappropriate."

It wasn't—it was very unprofessional in terms of the way that we would normally handle those situation[s] in terms of—

. . . . You know, there was kind of this ongoing body language from Virginia and she—I don't know what the direct trigger was in terms of on please, and her walking out, but you know, and the fact that we were talking about her communication style and that sort of thing. So—

. . . . As I was saying before, her body language was very negative, sarcastic. If we want to go, you know, in terms of just the overall language, body language, what she was saying, what she was doing, all around unprofessional, insubordinate. Those are the things that Joni and I talked about directly after the meeting, Joni, Mary and myself actually talked about after that meeting.

Both Petersen and Kovak acknowledged that Kish used no profanity during the course of this meeting. Neither Petersen nor Kovak specifically denied that Kish mentioned her two coworkers, as she testified.

One day following this meeting, on February 11 (and thus after the decision to discharge Kish had been arrived at and implemented), Kovak made a written recording of what had occurred during the disciplinary meeting, as follows:

2/10/11: we had a meeting this afternoon with Chris Petersen, Virginia Kish and Mary Neclerio (Virginia's direct manager) to deliver a final written warning to Virginia about her disrespectful and rude behavior. She said she didn't feel like she did anything wrong when I explained to her that the tone of her email dated February 3rd, 2011 was rude and disrespectful to which she disagreed. She further said that she thought we, as in all three of us, were harassing her (i.e. indicating by giving her multiple warnings). She said she was going to speak with her attorney about it (twice).

When Chris Petersen said that she was being disrespectful and insubordinate right now during our meeting, she responded by saying, "Oh Please!" with sarcasm. I explained the warning and why she was being given the warning and she said "what do I need to do" to which I said you just need to read and either sign it or not, and return it to me. She said she was going to refuse signing it but that she would review it. At that point she got up and left the office and closed the door behind her.

Petersen testified that this written summary accurately captures what transpired during the meeting.

### 6. The meeting's aftermath—Kish is discharged

Kovak testified that during her career as a human resource professional, no employee other than Kish had walked out of a disciplinary meeting. According to Petersen, after Kish left the managers discussed the fact that her body language was very negative, sarcastic, unprofessional, and insubordinate. As Kovak testified, the managers determined that Kish was not amenable to constructive feedback and that tolerating her misconduct did not set the right example for the rest of the group who work in close proximity. Thus, the decision was made to discharge her. When asked about his February 4 email referring to Kish's "history" and whether anything referred to thate factored into the decision to discharge Kish, Petersen testified that:

"I think everything's relevant when you're making that decision." When asked specifically if other incidents contributed to the termination decision, Petersen replied: "The incidents of her behavior and insubordination absolutely had an effect."

Shortly after the 2:30 p.m. meeting came to a close, Kish sent Kovak an email asking for a copy of her personnel file. At about 4 p.m. Kovak replied stating that she would provide it as soon as she could. Kish responded with an email thanking her.

At 4:30 p.m. Petersen approached Kish and escorted her back to Kovak's office. Kovak told Kish that it was not going to work out, and they had to let her go. She handed Kish a "pink slip" and said she would be receiving information about accrued vacation time and how to apply for unemployment insurance. Petersen testified that they told Kish that her behavior was inappropriate and insubordinate and that her employment was terminated. Kish was then accompanied by Peterson to her desk, and instructed to clean it out and leave the premises. Kish did not receive a written letter of termination. Kovak's notes pertaining to this meeting do not make specific reference to the reasons for Kish's discharge, but rather concern themselves with comments made by Kish at the time.[8]

### 7. Respondent's contentions to the Connecticut Department of Labor

It appears that Respondent initially contested Kish's claim for unemployment benefits, although they declined to attend a formal hearing. Kish was interviewed by an administrative law judge over the telephone and awarded benefits. Prior to this award of benefits, Kovak completed a questionnaire about the circumstances attending Kish's discharge.

In response to the question as to why the "individual was discharged or suspended," Kovak asserted that: "Ms. Kish was given the 2nd written warning for using foul language and/or disrespectful behavior, including insubordination. The warning was given on 2/10/11, the same day as termination."

Kovak further explained:

Ms. Kish had been spoken with repeatedly and given two warnings on her disrespectful behavior which she did not stop (two written warnings).

Ms. Kish is in violation of HCA's policy 8.1 "Performance Management" in the HCA employee handbook, which Ms. Kish had repeatedly acknowledged her commitment to comply with (annually). She created a difficult workplace.

In a section entitled "Additional Statements" Kovak added the following:

On Feb 10th, 2011 during the meeting on 2/10/11, Ms. Kish was again disrespectful and insubordinate to the 3 HCA managers present and twice during this meeting threatened legal action against HCA .She persisted that she did nothing wrong.

---

[8] Among other things noted by Kovak, Kish told the managers that they had done her a favor. Kish testified that she told them that they had done her a favor because employee morale was so low. Kish also mentioned some other possible job opportunities and said that she felt that she had been "built up to look like a bad person in the warnings and it's just her personality that people misinterpret and she didn't mean anything by the way she spoke."

14                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

All HCA employees receive a copy of the HCA employee handbook which contains policy 8.1 included here. All employees acknowledge reading the contents of the handbook and agree to abide by all the contents. Every year, all HCA employees, including Ms. Kish, acknowledge their commitment to uphold and abide by these policies. Therefore Ms. Kish knew what was expected of her and chose not to act accordingly.[9]

---

[9] Rule 8.1, referenced by Kovak, as set forth in the HCA employee handbook, provides as follows:

- **8.1 PERFORMANCE MANAGEMENT**
- Every organization must maintain performance standards and rules of conduct to protect the Interests of the members of the organization and to achieve established objectives.
- All employees are expected to meet Hitachi Capital America Corp. standards of work performance. Work performance encompasses many factors, including attendance, punctuality, personal conduct, appropriate dress, personal hygiene, job proficiency and general compliance with our policies and procedures. If an employee does not meet these standards, Hitachi Capital America Corp. may, under appropriate circumstances, take corrective action, Including written warnings, verbal warnings, probation and suspension.
- Please note that although Hitachi Capital America Corp. may choose to follow progressive discipline in some instances, the Company reserves the right to determine, in its sole discretion, the appropriate disciplinary action to be taken in any given circumstance. Any employee whose conduct, actions or performance violates or conflicts with our policies may be terminated immediately, with or without notice and with or without warning. No supervisor or other representative of the Company (except the President and other members of the Executive Committee) has the authority to enter into any agreement for employment for any specified period of time. As previously noted, HCA's policy of employment-at-will may only be modified by a formal contract, signed by both the employee and the President (or other member of the Executive Committee), evidencing HCA's intent to enter into a contract of employment.
- By way of example, infractions of the following rules may subject employees to· disciplinary action, including warning and possible termination:
- Irregular attendance, repeated tardiness
- Inefficiency or negligence In performing job or other performance deficiencies
- Permitting avoidable waste of material or supplies, carelessness, poor workmanship
- Using abusive or foul language
- Violation of health, housekeeping or safety rules, including littering grounds or work areas
- Visiting, loitering, loafing during working time, or disturbing other employees at work
- Horseplay
- Unauthorized solicitation of employees on behalf of any merchant, club or individual society, organization, political party, or religious group during working time and in working areas, whether for membership, subscription, or payment of money
- Repeated failure to accurately complete time cards

In her submission to the Connecticut Department of Labor, Kovak did not specifically identify which provision of the foregoing rule Kish was found to have violated which had resulted in her termination.

8. Respondent's work rules alleged to be unlawful

Respondent's employee handbook contains work rules for its employees in addition to those set forth above.

The General Counsel has contended that the following two provisions, contained in section 2.3 of Respondent's "Employee Conduct and Work Rules" are facially overbroad, in violation of Section 8(a)(1) of the Act:

Inappropriate behavior while on Company property

Leaving the Company or assigned work place (other than breaks or meal periods) during working hours without permission from a supervisor or other person authorized to grant permission.

The General Counsel has alleged that Kish was unlawfully discharged pursuant to the rule prohibiting "[i]nappropriate behavior while on company property" and that the rule prohibiting leaving the Company or assigned work place without permission violates Section 8(a)(1) by its mere maintenance. With regard to the rule prohibiting "inappropriate behavior" Kovak testified, "[i]t is a general rule. So you know, that's

---

- Unauthorized posting, removing or defacing posted material
- Inappropriate dress...and/or poor personal hygiene

Listed below are examples of some types of very serious infractions which can lead to immediate termination:

- Violation of any of the above listed infractions after a previous warning
- Preparing another employee's time record or falsifying anytime record
- Creating a disturbance, fighting
- Gambling on company property
- Falsifying production or other company records
- Destroying or defacing company property
- Arriving at work under the Influence of alcohol or illegal drugs, or use, sale or dispensing of drugs or alcohol on company premises, or otherwise reporting to work in a manner unfit to perform work duties.
- Insubordination
- Sleeping on the job
- Walking off the job during working hours or leaving the company premises without permission, or as is reasonably expected
- Smoking in prohibited areas
- Theft of company or personal property
- Possession or use of firearms or other weapons on company premises or in the course of performing company duties

These lists are intended to be representative of the types of activities that may·· result in disciplinary action. It is not exhaustive and it does not change the employment-at-will relationship between the employee and the Company.

Employees who are on formal written warning are not eligible for salary increases, bonus awards, promotions or transfers during the warning period.

pretty broad, but whatever we deem inappropriate is dealt with."

The entirety of Section 2.3 is as follows:

### 2.3 EMPLOYEE CONDUCT AND WORK RULES

Hitachi Capital America Corp. expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization.

It is not possible to list all the forms of behavior that are considered unacceptable in the workplace. The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment:

- Failure to change or improve inappropriate behavior or performance.
- Swiping an identification badge other than your own or falsifying work hours.
- Abusive or threatening language to any employee, visitor or customer.
- Sleeping or loafing while on the job at any time other than during established break periods.
- Inappropriate behavior while on Company property. Leaving the Company or assigned work place (other than breaks &meal periods) during working hours without permission from a supervisor or other person authorized to grant permission.
- Conduct that violates common decency or morality (I.e. bribery, harassment, etc.).
- Involvement in the following activities may result in prosecution: obtaining material; property or money from the Company by fraudulent means or misrepresentation; stealing, willfully damaging, or maliciously hiding any property of an employee, guest or the Company.
- Falsifying records/data or reports (including but not limited to: personnel records, timekeeping and attendance, production, inventory, accounting or, other records of the organization).
- Falsification of information provided or given in connection with employment.
- Divulging information of a confidential nature to unauthorized persons.
- Failure to disclose in an application for employment a conviction of any criminal offense (felony or misdemeanor).
- Failure to accept job assignments or the refusal to obey legitimate directives of a supervisor or authorized individual.
- Reporting to work under the influence of alcohol or an unauthorized controlled substance; possessing or using liquor or an unauthorized controlled substance on Company premises.
- Carrying a weapon on Company premises.
- Failure to return to work as scheduled at the end of an authorized leave of absence.
- Inappropriate use of Company communication devices.
- Inappropriate use of Company vehicles, credit cards, or expenses.

Kovak acknowledged that Respondent expects employees to abide by these rules and they will be enforced as appropriate. She also testified that generally, Respondent follows the following progressive discipline model: one or more verbal warnings, progressing to written warnings and then termination. Employees are generally not suspended for infractions.

### 9. Kish's prior discipline and complaints about her demeanor

Respondent introduced into evidence an anonymous note complaining about Kish's behavior as follows:

Virginia Kish has become a daily distraction to everyone around her.

Her behavior is unprofessional, arrogant and offensive. She repeatedly uses foul language, slams her phone down pounds on her keyboard and has created a hostile environment that no one will tolerate any longer. Her unnecessary use of speakerphone is also creating an unpleasant working environment. We feel these issues need to be addressed immediately with her managers.

There is the following notation on the note. "Received in the suggestion box. Picked up 5/1/08 KM." Neither Morlock, Kovak, nor Petersen offered any specific testimony regarding this note, although when confronted with the note by Respondent, Kish admitted that it had been shown to her at the time.[10] There is no evidence that any investigation was undertaken with respect to the allegations or that Kish was issued any discipline based upon these anonymous allegations.

Petersen also testified that previously, in a team meeting in January 2010, he had addressed everyone about general complaints he had received regarding the use of profane language, some of which came from the vicinity of Kish's desk along with that of one other employee. As a followup, in February 2010, Kovak issued the following memorandum addressed to all employees:

It has come to our attention that there has been an excessive amount of loud and repeated profane language heard in the halls of our workplace. In keeping with the HCA Code of Conduct, all employees are expected to exhibit professional behavior. Repeated use of foul language is offensive and unacceptable and may be punishable with a written warning.

In August 2010, Respondent implemented a random telephone call monitoring procedure for "quality assurance." Kish testified that on September 11, 2010, she was called into a meeting with Petersen and Neclerio where she received a written warning, for "inappropriate/profane language use and overly aggressive/rude behavior" as follows:

During a review of Virginia's calls, it was noted that inappropriate/profane language was used while on an open line when making a collection call. In general Virginia's communication

---

[10] Kovak appeared to be unfamiliar with it, as she testified that it was received in 2011.

16                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

with clients has been overly aggressive and rude based upon the calls that were monitored.

As indicated in the HCA Employee Handbook, under Employee Conduct and Work Rules and Performance Management sections, abusive or foul language toward an employee, visitor, or customer is not acceptable. Every employee is expected to treat customers in a professional manner at all times.

Furthermore, reminders from Vice President Chris Petersen in January 2010 and Vice President of Human Resources, Joni Kovak dated February 3, 2010, indicated that under no circumstances is profane/foul language accepted or permitted in the workplace.

Be advised this is a written warning, as indicated in the handbook, going forward any use of inappropriate/profane language or overly aggressive and rude behavior can result in further disciplinary action up [to] and including possible termination.

Petersen testified that he issued this warning to Kish after he discovered that she had used profanity on an open line through a random selection of calls for review. As Petersen testified, after he heard this call, he listened to others and found other situations where he considered Kish to be overly aggressive and rude. None of the other calls Petersen monitored were found to contain profanity. [11]

When Kish was called into the meeting, Petersen played a recording of Kish placing a telephone call to a client. As the phone was ringing, Kish muttered, "fucking people." It is not clear from the recording, which was played several times at the hearing, whether the client had picked up the telephone prior to the utterance of the expletive. Kish and Petersen disagreed on that issue: he believed the client had heard it and Kish disagreed that could have been the case. In any event, Kish acknowledged and apologized for her use of profanity and said she would do better in the future. Petersen said he would like to send her, and others, to a communications course. He then handed her the above warning.

Kish refused to sign the warning, disputing that the client had heard the profanity or that her manner had been overly rude or aggressive. She did acknowledge that her use of profanity was inappropriate.

Petersen testified that on various occasions between September 2010 and February 2011 he counseled or coached Kish on her behavior. He offered scant details about the specific circumstances giving rise to his need to do so, or the coaching sessions themselves other than stating that, during team meetings, Kish tended to be "a little bit negative" in terms of her body language, which included sighing and rolling her eyes. Kovak testified that Petersen had told her that he had coached Virginia after a team meeting for a "display of inappropriate behavior, rolling her eyes, gestures, loud sighs, things of that nature. . . ." Although Petersen testified that he would not necessarily document such coaching sessions, in another context, Petersen testified that "[a]ny time we have coaching like cor-

rective action sessions such as this, I communicate to Ryan [Collison] just to let him know what the situation is." Kovak testified that it was customary to alert her to the fact that a verbal counseling had been done with an employee and that the better managers did document such coaching sessions. There are no documents in evidence which specifically reflect any coaching or counseling which Petersen may have conducted with Kish.

<h4>10. The General Counsel's evidence regarding alleged disparate treatment</h4>

Records subpoenaed by the General Counsel and placed into evidence contain certain notes and other evidence which, as the General Counsel contends, support its contention that Kish was a victim of disparate treatment.

In particular, the General Counsel relies upon the employment records of employee Johnson. This employee received a "final written warning" on February 22, 2011, which documents a series of rather extensive performance-related problems dating from October 2010 including "incomplete and inaccurate documenting of accounts and coding of accounts and follow-up." At the time this warning was administered to him, according to Kovak's notes, this employee "became very argumentative and told Chris (Petersen) he was wrong and lying." The testimony of both Petersen and Kovak confirms this point as well. Two months later, this same employee received another "final written warning" regarding "continued performance issues and lack of improvement." Johnson was terminated on May 10.[12]

Kovak testified that Johnson was an employee with performance-related problems who did not respond well to the above-mentioned disciplinary meeting. He was not terminated at the time because Respondent was trying to give him the benefit of the doubt, as he was not originally from the United States and it was thought there might be a communications problem. Kovak further testified that although this employee could be disagreeable and defensive it was not to the point where people thought they could not work with him.

The General Counsel also relies upon the employment record of another employee, Pils, who was not discharged and eventually resigned her position with the Company several weeks prior to the hearing in this matter. In her notes, Kovak remarked on October 22, 2010, that Pils warranted a written warning because she had been "disrespectful of people in more senior positions, especially Mary Neclerio, [former department supervisor] Mary Wynn and myself—there have been written and verbal notes on her behavior." In the November 2, 2010 warning that was eventually administered to Pils, Neclerio, and Petersen noted her "recent insubordinate communications toward three HCA managers, low call volume and excessive personal calls." It was further noted that Pils had previously received counseling. Specific instances outlined in the warning included: disrespectful and insubordinate behavior toward Neclerio; a disrespectful email sent to Morlock blaming Kovak for problems with her benefits and an insubordinate and sarcas-

---

[11] Petersen acknowledged that Respondent maintained "thousands" of recordings of Kish's telephone calls to clients.

[12] It appears that this employee also falsified information on his employment application and that this was known to management as early as October 2009.

tic response to Neclerio in reply to an inquiry relating scheduling matters.

### 1. Respondent discharged Kish due to concerted, protected conduct in violation of Section 8(a)(1) of the Act

Section 8(a)(1) of the Act prohibits interference with activity protected by Section 7, which protects employees' right to "self-organization . . . and to engage in other concerted activity . . . for mutual aid and protection."

The threshold issue to be determined in this prong of the General Counsel's case is whether Kish's conduct was concerted or exclusively, as Respondent asserts, "self-focused grumbling." Given the record as a whole, I find that there is sufficient evidence to conclude that Kish's emails fall within the ambit of Section 7. I further find that not only did Kish engage in concerted activity, but also that this conduct was protected under the Act and, moreover, that Kish did not forfeit the protections of the Act.

In its lead case on concerted activity, the Board explained that "to find an employee's activity to be 'concerted,' we shall require that it be engaged in with or on the authority of other employees and not solely by and on behalf of the employee himself." *Myers Industries*, 268 NLRB 493, 497 (1984) (*Myers I*), remanded sub nom. *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985). Following a remand from the United States Court of Appeals for the District of Columbia Circuit, the Board clarified that the enunciated standard, "encompasses those circumstances where individual employees seek to initiate or prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." *Myers Industries*, 280 NLRB 882, 887 (1986) (*Myers II*), enfd. sub nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988).

Here, it is not disputed that Kish acted alone. She did not inform her similarly-situated coworkers about her plans; nor did she seek their authorization. However, the unilateral nature of her actions does not automatically compel the conclusion that she did not engage in concerted activity. In particular, the Board has, under a variety of circumstances, found concerted activity to exist where the evidence supports a finding that the concerns expressed by the individual employee are a logical outgrowth of the concerns expressed by the group. See *Mike Yurosek & Son, Inc.*, 306 NLRB 1037 (1992); *Salisbury Hotel, Inc.*, 283 NLRB 685, 687 (1987). Moreover, while no group action may have been contemplated, the actions of a single employee can be deemed concerted when it constitutes a continuation of protected communications with coworkers about terms and conditions of employment. See, e.g., *Summit Regional Medical Center*, 357 NLRB No 134, slip op. at 4 (2011) (and cases cited therein at fn. 13); *Every Woman's Place*, 282 NLRB 413 (1986), enfd. mem. 833 F.2d 1012 (6th Cir. 1987).

I agree with Respondent that Kish's emails largely demonstrated an individual response to her own working conditions. I also find, however, that this does not fully or exclusively describe Kish's intentions or the nature of her expression to her superiors. Kish's decision to email Morlock, Kovak, and Petersen stemmed from a discussion with a coworker about a disfavored managerial decision affecting several employees regarding what they all believed to be promised compensation and/or benefits. Kish announced to her coworker that she would ask about this. Their discussion, albeit brief, clearly constitutes concerted and protected activity. See, e.g., *Salvation Army*, 345 NLRB 550, 561 (2005); *Aroostook County Regional Ophthalmology Center*, 317 NLRB 218, 220 (1995), enf. denied in relevant part 81 F.3d 209 (D.C. Cir 1996).

Kish's initial email was an outgrowth of this protected conduct. And, it must be noted that, prior to the time Kish sent this email, Neclerio had inquired about the amount of comptime that certain collections department employees would receive for the prior morning: thus, Neclerio, Kovak, and Morlock were all aware that two other employees in that department found themselves in comparable circumstances. Moreover, management's response to Kish's inquiries would have affected both Cocchia and Gaetano. The use of the pronouns "us" and "we" in Kish's emails demonstrate that the adverse impact of Respondent's policies on these employees also played a part in her thinking.

Moreover, it is apparent from Kish's emails, Kovak's testimony, and the written warning issued to Kish by Respondent that Kish's emails were, at least in part, viewed as a general (albeit, in Respondent's view inappropriate) protest that the decision to limit comptime to core office hours had not been previously or sufficiently explained to employees. In particular, Kish wrote: "I think this should have been explained to us earlier than after the fact." Even as she stated her objection to the tone of Kish's emails, Kovak also testified Kish had improperly raised complaints regarding the manner in which the IWD policy had been explained to employees: "But the way she just attacks Kate for the lack of clarification, it's not Kate's fault. She didn't develop the policy, she didn't roll it out. I did, you know, in conjunction with the senior team. So she shouldn't be attacking Kate."

The record reflects that Respondent took umbrage at not only the tone but the content of Kish's emails. In their testimony at hearing, both Morlock and Kovak acknowledged that employees had not been fully informed about ambiguities in the application and enforcement of the IWD policy and maintained that they sought to respond to employee inquiries. However, Kish's warning takes a contrary position. There, Respondent admonishes Kish not only for her "disrespectful, rude behavior" but further specifically reproaches her for raising questions about the clarity of the IWD policy as follows:

> You are expected to address policy concerns proactively versus waiting until an issue occurs. Your problem with the IWD late opening was entirely preventable by you. Blaming others for your lack of understanding is unacceptable.

Such comments suggest that it was not only Kish's specific demand for additional comptime for herself, but also her complaint that the policy had not been previously explained to her and other employees generally which drew the ire of her superiors. Respondent's apparent attempt to conflate the two issues is therefore unavailing.

Thus, while Respondent is correct when it argues that Kish was protesting her individual loss of anticipated comptime, the

18                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

evidence shows that there was another issue at play here: dissatisfaction and frustration with the lack of communication regarding the manner in which the IWD policy was being implemented. Moreover, I find that the evidence is sufficient to support a finding that Kish also acted due to the adverse impact of Respondent's decision on her two coworkers who, as Kish credibly maintained, labored under the illusion that they would be receiving credit for all hours worked, as reflected in her statement that: "I feel we should be comped the 31/2 hours and if this is not the procedure going forward I would understand but right now I do not agree with it being told to me after the fact." These comments suggest that Kish's conduct is a manifestation of both personal and collective concerns, even where, as is the case here, similarly affected other employees decided not to protest or question the manner in which the IWD policy was being implemented. *Dayton Typographic Service*, 273 NLRB 1205 (1984), enfd. in pertinent part 228 F.2d 1188, 1141–1142 (6th Cir. 1985) (complaint made by employee about Saturday work, without compensation, continuation of prior complaints made by other employees, although other employees had decided not to pursue issue).

I also find that there is sufficient evidence to show that Respondent was aware that this was a matter that went beyond Kish's own employment situation. As noted above, Neclerio's initial email to Kovak and Morlock outlining the hours worked in her department prior to the official opening of the office on February 2, showed that there were three of nine department employees who would be adversely affected by any decision to limit comptime to core office hours. Moreover, "[t]he concerted nature of an employee's protest may (but need not) be revealed by evidence that the employee used terms like 'us' or 'we' when voicing complaints, even when the employee had not solicited coworkers' views beforehand." *Worldmark by Wyndham*, 356 NLRB No 104, slip op. at 2 (2011) (and cases cited therein).

I find that Morlock's characterization of Kish's inquires as a "nightmare" requiring further discussion among management personnel additionally supports a finding that Respondent was on notice that the implications of Kish's emails would extend beyond her individual circumstances. Moreover, Respondent has admitted that other employees did not fully understand how the IWD policy would be implemented with regard to various issues including the use of vacation time and part-time work and had brought questions to the attention of management.

Thus, the record supports the conclusion that Hitachi managerial and human resources personnel were aware of the fact that their new IWD policy had not been adequately explained, had generated confusion in the minds of employees, and moreover that certain employees were under a misapprehension about the benefits such a policy would confer. See *JMC Transport*, 272 NLRB 545 fn. 2 (1984) (exchange between employee and supervisor over alleged discrepancy in employee's paycheck concerted, as it grew out of earlier concerted complaints by two employees concerning same subject matter, pay structure, although issue complained about was not the same).

Respondent has argued that Kish failed to provide specific evidence about what had been said by either Gaetano or

Cocchia and that therefore, the evidence is insufficient to show that Kish's conduct was a continuation or logical outgrowth of prior concerted activity. However, Kish did offer detailed testimony about her interaction with Cocchia in this regard. Again, while brief, this exchange was concerted in nature. Moreover, I have credited Kish's testimony (to which no specific denial was offered by Respondent's witnesses) that she named coworkers in her meetings, first with Petersen and then during the administration of the written warning, and was abruptly cut off as she tried to do so.

Respondent's assertion that management did not understand Kish's emails to be referring to any individual other than herself is therefore belied by other record evidence including Neclerio's initial email, Kish's use of collective pronouns in her emails, her references to other employees in meetings with managerial personnel as well as by Morlock and Kovak's admissions that a number of other employees were confused about the IWD policy. This is not a case, as Respondent attempts to suggest, where Kish invoked the names of her coworkers purely as an afterthought, after disciplinary decisions were made. Rather, she sought to defend her conduct in real time by arguing that she was not alone in her concerns. This was a matter which would have been apparent to Respondent at the time. In rejecting Respondent's contention that Kish's testimony in this regard was fabricated, I note that had she chosen to create such an account out of whole cloth, she easily could have constructed a more elaborate evocation of her coworkers' sentiments and their interactions. Her account is inherently plausible because it is not overstated.

Moreover, even if I were to credit Respondent's contentions regarding the managers' subjective beliefs as to the individual nature of Kish's protest, such a misapprehension is insufficient to remove otherwise protected conduct from the ambit of the Act. The Board has long held that the fact that an employer may have acted in good faith is immaterial where the activity for which the employee was discharged was actually protected by the Act. To excuse the employer because of even a good-faith mistake would materially weaken the guarantees of the Act and would allow the employer's state of mind to impermissibly vary the extent of employees' protected rights. *Montgomery Ward & Co.*, 179 NLRB 686, 692 (1969).

For the above reasons, Respondent's reliance on *Summit Regional Medical Center*, 357 NLRB No. 134 (2011), is misplaced. In that case, the Board concluded that while an employee's mocking protest of her employer's dietary policy was for "mutual aid and protection" as the policy affected other employees' terms and conditions of employment, the conduct for which she was discharged was not concerted in nature. The Board also found that the evidence was insufficient to show that her conduct at the nurses' station (where she spontaneously "poked fun" at the policy) was a continuation or logical outgrowth of prior concerted activity. 357 NLRB 134, slip op. at 4.

In support of its contentions that Kish's emails were not concerted in nature, Respondent also relies upon *Reynolds Electric, Inc.*, 342 NLRB 156, (2004). There, the Board dismissed the 8(a)(1) allegation pertaining to the layoff of an employee because "the evidence was far too speculative to support a finding that the knowledge element of a prima facie case" was estab-

lished. Thus, the Board's decision does not hinge on the issue of what constitutes protected activity generally, but rather addresses the question of whether the proper burden of proof in a particular case alleging discriminatory conduct has been met. The situation in *Reynolds Electric* is further distinguishable factually. There, the employee in question, an electrician, did not work in the same job classification as the employees he spoke with about "prevailing wage jobs." The Board majority found that his contacts with these other employees, who worked as carpenters, were "simply informational." 342 NLRB at 157. Here, Kish spoke with at least one other coworker who was similarly situated and confronted the same loss of anticipated benefits, used the words "us" and "we" in her written communications to Respondent and specifically attempted to mention on two occasions that the comp time policy affected other employees as well. In *Reynolds*, the Board observed that a "one-on-one conversation between an employee and an employer is not, without more, concerted activity." 342 NLRB 156 fn. 2. However, the Board has also opined that "ostensibly individual activity may in fact be concerted activity if it directly involves the furtherance of rights which inure to the benefits of fellow employees." *Anco Insulations, Inc.*, 247 NLRB 612 (1980). Here, contrary to the situation in *Reynolds Electric*, supra, I find that there is "more": that is, even to the extent that Kish's emails reflected a concern with her own particular situation, her protest also implicated the terms and conditions of employment of her coworkers and inured to their benefit.

Having concluded that Kish's emails were, at least in part, concerted in nature I further find that they were protected insofar as they related to core issues of employment. Respondent has argued that even if concerted in nature, Kish's communications were of a nature to cost her the protections of the Act. In support of these contentions, Respondent argues that under *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964), it has met its initial burden to show that it had an honest belief that Kish engaged in misconduct and that the General Counsel has failed to sustain its burden of showing such misconduct did not, in fact, occur. Alternatively, Respondent argues that Kish forfeited statutory protection by virtue of her insubordination. I address this latter argument first.

Board law, supported by the courts, is that employees are permitted some leeway for impulsive behavior when engaging in concerted activity, subject to the employer's right to maintain order and respect in the workplace. See *Piper Realty Co.*, 313 NLRB 1289, 1290 (1994); *NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 207 (7th Cir. 1991); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965).

In assessing such conduct, the Board looks at four factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practices. *Atlantic Steel Co.*, 245 NLRB 814 (1979); *Datwyler Rubber & Plastics Co.*, 350 NLRB 660 (2007).

In that regard, the standard for determining whether specified conduct is removed from the protections of the Act is whether the conduct is "so violent or of such serious character as to

render the employee unfit for further service." *St. Margaret Mercy Healthcare Centers*, 350 NLRB 203, 204–205 (2007).

The rationale behind such a stringent standard, as set forth by the Board, is as follows:

> The protections of Section 7 would be meaningless were we not to take into account the realities of industrial life and the fact that disputes over wages, bonus and working conditions are among the disputes most likely to engender ill feelings and strong responses.

*Consumers Power Co.*, 282 NLRB 130, 132 (1986).

In addressing the *Atlantic Steel* factors, Respondent focuses exclusively on Kish's behavior and demeanor in the meeting where the disciplinary notice was presented to her. However, before we come to evaluate that event, it is necessary to focus on whether the tone and content of Kish's emails were insubordinate to the extent that they would have cost her the protections of the Act. For the following reasons I conclude that they did not.

Addressing the first factor, under all the circumstances, I find the "location" of Kish's initial communications to Respondent favors protection. Kish did not disseminate her inquiries and criticisms to her coworkers. Rather, she addressed them to the appropriate managerial and benefits personnel. Assuming that these individuals genuinely took issue with the tone of the emails, no other employee other than these designated individuals had occasion to see or be influenced by them and there was no evidence of disruption to the ordinary conduct of business at the facility.

As to the second factor, I conclude that the subject matter of the discussion weighs in favor of protection. Kish's comments and inquiries focused on compensation and benefits—core terms and conditions of employment. And, as discussed above, her emails had implications for several employees at the least.

As to the third factor, I find that the nature of Kish's comments do not weigh against protection. I agree that one could reasonably construe her tone, particularly in the first two emails, as ill-mannered, and perhaps more. However, the Board has found that unpleasantries uttered in the course of concerted, protected activity that fall short of conduct that is truly insubordinate or disruptive of the work process do not strip the employee of the protections of the Act. See, e.g., *Postal Service*, 241 NLRB 389 (1979) (letter characterizing acting supervisors as "a-holes"); *Harris Corp.*, 269 NLRB 733, 738 (1984) (letter describing management with words such as "hypocritical," "despotic" and "tyrannical" not disqualifying notwithstanding its "boorish, ill-bred and hostile" tone); *Gloves Truck & Trailer*, 281 NLRB 1194, 1195 (1986) (statement to other employees that chief executive officer was a "cheap son of a bitch" protected concerted activity). Kish's comments to Morlock and her superiors pale by comparison here.

Finally, I find that the fourth factor, provocation, does not weigh in favor of protection as there was no evidence of prior or concurrent unfair labor practices related to the implementation or application of the IWD policy which occurred prior to Kish's emails. See *American Steel Erectors, Inc.*, 339 NLRB 1315, 1317 (2003). However, this is the only factor which does not favor continued protection.

20                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

In sum, I find that the first three factors militate in favor of finding that Kish's email communications were not sufficiently insubordinate or opprobrious as to remove her from the protections afforded by the Act.

For the foregoing reasons, I also conclude that Respondent is not privileged to assert, as it does in its posthearing brief, that Kish's protected emails constitute "misconduct" under the analytical framework of *Burnup & Sims*, supra.

### 2. Kish's conduct at the administration of the February 10 warning

Based upon the foregoing, I conclude that Respondent's decision to issue a written warning to Kish on February 10 stemmed not only from the tenor of her complaint but also from its content: in particular, her concerted, protected protest about the lack of clarity and the manner in which the IWD policy was being administered generally.[13] Respondent is contending that it was Kish's conduct at this meeting which led to the decision to terminate her. For the reasons discussed below, I reject this contention and also find that the decision to terminate Kish is appropriately analyzed under *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399–403 (1983). Before we reach that point, however, certain credibility resolutions about what occurred at the February 10 meeting should be addressed.

Generally, I find that Kovak and Petersen's account of Kish's conduct at the February 10 meeting is overstated. In reaching this conclusion I rely not only upon Kish's testimony, which I credit in several significant respects, but on Kovak's written description of the meeting, prepared shortly after it occurred and introduced into evidence by Respondent as well as her submission to the Connecticut Department of Labor.[14]

Kovak and Petersen testified that as the reasons for the warning were explained to Kish she stated (on more than one occasion) that she was going to talk to her attorney; she said, "oh please;" and demonstrated "negative body language" in particular by throwing her head back and by rolling her eyes. Kovak testified that Kish became flustered and angry, that both Kish and Petersen were exasperated, that Kish accused the managers of harassing her and made various gestures. Petersen specifically noted that the managers, in particular Neclerio, were trying to calm Kish down. Both Petersen and Kovak testified that Kish refused to sign the warning and walked out of the meeting before it had been concluded.

Kovak's written account of this meeting, which she recorded shortly after it occurred, and which Petersen conceded is accurate, presents a more restrained version of events. Kovak wrote when she told Kish that the tone of her email dated February 3, 2011, was rude and disrespectful, Kish disagreed and stated that she did not think she had done anything wrong. She accused the managers of harassing her and twice stated she was going to

speak with her attorney. Kovak further noted that when Petersen pointed out that Kish was being disrespectful and insubordinate during the meeting, she responded by saying, "Oh Please!" with sarcasm. After the warning was explained, Kish asked, "[W]hat do I need to do," and Kovak said she should read it and either sign it or not, and return it to her. Kish replied that she was going to refuse to sign it but that she would review it. She then got up and left the office and closed the door behind her.

Thus, there is no reference in Kovak's contemporaneous written account to "negative body language," "rolling eyes," and "throwing back of the head," of Kish "making gestures," becoming "flustered and angry," of "exasperation" or of anyone attempting to "calm [Kish] down." I note that Kovak testified that Petersen had told her he had previously coached Kish with regard to similar behaviors. Had this in fact been the case, I find it more likely than not that Kovak would have made a point of documenting such forms of negative verbal and nonverbal communications had they been demonstrated at the time. I also note, in particular, that there is no specific mention in Kovak's account of Kish abruptly walking out of the meeting prior to its conclusion.

I additionally note there is no mention of any of these behaviors in Kovak's written submission to the Connecticut Department of Labor. There, Kovak asserted only that Kish received a second written warning for "foul language and/or disrespectful behavior."[15] Describing the disciplinary meeting, Kovak asserts generally that Kish was "disrespectful and insubordinate" to the managers present. The only specific examples of such conduct Kovak noted, however, were "a threat of legal action" and the fact that Kish "persisted that she did nothing wrong." Moreover, although Kovak asserts that Kish is in violation of rule 8.1, she fails to specifically identify which of any number of prohibitions Kish purportedly violated.

With regard to Respondent's contention that Kish walked out of the meeting before it was over, I note that neither Kovak nor Petersen offered any testimony whatsoever about why the meeting was not over at the point when Kish left the room. As they both testified, the warning had been presented and explained to Kish. What else was there to accomplish? If there was anything unsaid or left open, neither Petersen nor Kovak provided any indication of what that might be. Going by Kovak's written account, it seems entirely reasonable for Kish to have concluded the meeting was over at that point.

As noted above, I credit certain salient aspects of Kish's testimony regarding what occurred during this meeting. For example, I credit her specific and unrebutted testimony that when Kish stated that she would not sign the warning and was going to consult an attorney, Kovak characterized her comment as a "threat" and stated: "Don't think we didn't talk to our attorneys about you and what we're going to do to you." In fact, the record reflects that Kovak contacted counsel on several occasions in the days prior to Kish's discharge and characterized Kish's statement that she was going to consult an attorney as a "threat" in her submission to the Connecticut DOL. As discussed above,

---

[13] The administration of the warning itself was not alleged as an independent violation of the Act and, accordingly, I make no such finding.

[14] I deem both of these statements, to the extent they are inconsistent with the testimony of Kovak and Petersen, to be admissions against interest.

[15] As noted above, it is undisputed that Kish did not use profanity in her emails or during the February 10 disciplinary meeting.

I credit Kish's unrebutted testimony that she raised, or attempted to raise, the issue of her coworkers during this meeting and note that she was prevented from doing so. I also credit her specific testimony that Kovak attempted to redirect the conversation by insisting that Kish had brought this upon herself and that "no one had a problem with this except for you." Again, Kovak did not deny she made such a comment and, tellingly, I find that Kovak's remarks related not only to the tone, but to the content of Kish's emails as well. Moreover, I conclude that her comments to Kish demonstrate that Kovak, a highly experienced human resources professional, was aware that conduct protected by the Act was implicated in this instance and was seeking to avoid having such a discussion. I further credit Kish that, before she left the room, she inquired whether the meeting was over.[16] For the most part, I found that Kish's account of what occurred at the meeting was precise as to what was said and how the participants conducted themselves and her testimony generally had the ring of truth.[17]

Respondent contends that it was Kish's conduct at this meeting, unrelated to any activity falling within the parameters of Section 7 which is solely responsible for her discharge. As a factual matter, this is not supported by the record; in particular Petersen specifically testified that he considered Kish's entire record in reaching the decision to discharge her. Moreover, Kish's discharge was being actively considered as of February 4, well prior to the meeting in question. And, it must be noted that at the hearing in this matter, Respondent documented every flaw in Kish's employment record and recounts these issues in its posthearing brief.

Respondent further argues that even if it were to be found that Kish had engaged in protected conduct, under the principles of *Atlantic Steel*, supra, her conduct in the February 10 disciplinary meeting would have forfeited the protections of the Act. Applying the four-factor test outlined above, Respondent concedes that Kish's alleged insubordination took place within the confines of a closed-door meeting, but argues that her demonstration of a complete lack of respect for Petersen, in the presence of Neclerio and Kovak "would reasonably tend to

affect workplace discipline by undermining the authority of the supervisor subject to the vituperative attack." *DaimlerChrysler Corp.*, 344 NLRB 1324, 1329 (2005). In the case cited by Respondent, however, the employee in question engaged in sustained profanity in a large open area full of cubicles occupied by supervisory and nonsupervisory personnel, quite a few other employees were in the immediate area and the outburst in question was overheard by other employees in adjacent areas. None of these factors are at issue here.

Respondent further contends that the second and third factors similarly favor a forfeiture of protection in that the discussion was disciplinary in nature, centered exclusively on Kish and because while her "outburst" was brief, it was plainly insubordinate. In support of these contentions, Respondent cites *Cellco Partnership*, 349 NLRB 640, 642 (2007). However, in that case, as Respondent concedes, the employee's two outbursts were found to be "profane and insubordinate." In particular, the employee was disciplined, in part, for making profane comments in an open work area where they could be heard by others and likely would have had a disruptive effect on workplace discipline. Here, as acknowledged by Respondent, Kish used no profanity and her alleged insubordinate attitude has been found, based upon contradictory evidence submitted by Respondent, to be overstated, to say the least.

I credit Respondent's contentions that Morlock, Kovak, and Petersen were offended, to varying degrees, by certain of Kish's comments, although I have concluded that this, too, has been embellished, at least in part.[18] In any event, however, such subjective reactions are is not sufficient to cost Kish the protections of the Act. "The Board has long held that legitimate managerial concerns to prevent harassment do not justify policies that discourage the free exercise of Section 7 rights by subjecting employees to investigation and possible discipline on the basis of the subjective reactions of others to their protected activity." *Consolidated Diesel Co.*, 332 NLRB 1019, 1020 and fn. 6 (2000) (and cases cited therein), enfd. 263 F.3d 345 (4th Cir. 2001).

In any event, contrary to Respondent, I have concluded that *Atlantic Steel* is not the appropriate analytical framework to apply in analyzing Kish's discharge. While Respondent has argued that it was Kish's conduct at the February 10 meeting, and that alone which prompted the determination to discharge her, the weight of the evidence rebuts that assertion. Rather, I have concluded that the record establishes that Kish's emails played a prominent role in Respondent's decision to terminate her employment. And, it should be noted that Respondent maintains that Kish was not engaged in protected conduct during the February 10 meeting. Thus, this is not the sort of situa-

---

[16] Respondent argues that this testimony should not be credited because it is omitted from the witness statement provided by Kish to the Board during its investigation of her charge. In fact, Kish did state that she inquired whether they were finished, at which point, Kovak handed her the written warning with the emails attached. It is the case that Kish failed to mention that Kovak replied that they were finished. Kish stated that she must have overlooked this fact in recounting events. Under all the circumstances, I find this to be a plausible explanation. In any event, as I noted above, I think Kish had good reason to conclude that the meeting was over and credit her assertion that she did not storm out of the room, as Respondent suggests.

[17] Respondent points to and attempts to discredit Kish's account by citing her testimony that Kovak "giggled" at the outset of the meeting. Respondent argues that a professional such as Kovak would not engage in such behavior and, in fact, she so testified, as did Petersen. I note, however, that while Kish's description of Kovak's behavior may have been inartful, when demonstrating what Kovak did at that point, the character of which is not reflected in the written record, Kish gave a plausible imitation of someone making a vocalization intended to demonstrate irony—which is consistent with the nature of Kovak's initial comments at the outset of the meeting (i.e., "We meet again").

[18] Although Kovak testified that Morlock was "very much" offended by the emails telling her, "I was just shocked" by Kish's language, Morlock was more restrained in her description of her subjective reactions. This is yet another example of Kovak's propensity to overstate matters. As for any description of Neclerio's response to the emails, I find that this hearsay evidence is rebutted by Kish's testimony that Neclerio disclaimed any interest in disciplining her. Had Respondent sought to document Neclerio's reaction, or rebut Kish's testimony about her reticence to participate in the warning, the record reflects no reason why it could not have called her as a witness.

tion contemplated by *Atlantic Steel*, where an employee outburst which occurs during the course of protected conduct is the admitted and acknowledged reason for the discharge. Under all the circumstances, I conclude that this case raises questions of employer motive which are more properly analyzed under *Wright Line* and its progeny. See, e.g., *Alton H. Piester, LLC*, 353 NLRB 369, 372–374 and fn. 25 (2008).

### 3. The *Wright Line* factors

Allegations of discrimination which turn on employer motivation are analyzed under the framework set forth in *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982). To establish a violation of Section 8(a)(3) under *Wright Line*, the General Counsel must first show, by a preponderance of the evidence, that the employee engaged in protected concerted activity, the employer was aware of that activity, and the activity was a substantial or motivating reason for the employer's action. *Wright Line*, supra; *Naomi Knitting Plant*, 328 NLRB 1279, 1281 (1999). Proof of an employer's motive can be based upon direct evidence or can be inferred from circumstantial evidence, based on the record as a whole. *Ronin Shipbuilding*, 330 NLRB 464 (2000); *Robert Orr/Sysco Food Services*, 343 NLRB 1183 (2004); enfd. mem. 184 Fed. Appx. 476 (6th Cir. 2006); *West Maui Resort Partners*, 340 NLRB 846, 848 (2003). The Board has long held that where adverse action occurs shortly after an employee has engaged in protected activity an inference of unlawful motive is raised. See *McClendon Electrical Services*, 340 NLRB 613 fn. 6 (2003) (citing *La Gloria Oil & Gas Co.*, 337 NLRB 1120 (2002), enfd. mem. 71 Fed. Appx. 441 (5th Cir. 2003)). As part of its initial showing, the General Counsel may offer proof that the employer's reasons for the personnel decision were pretextual. *Pro-Spec Painting, Inc.*, 339 NLRB 946, 949 (2003); *Laro Maintenance Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995); see also *Real Foods Co.*, 350 NLRB 309, 312 fn. 17 (2007) (unlawful motivation demonstrated not only by direct, but by circumstantial evidence such as timing, disparate or inconsistent treatment, expressed hostility, departure from past practice and shifting or pretextual reasons being offered for the action). In addition, proof of an employer's animus may be based upon other circumstantial evidence, such as the employer's contemporaneous commission of other unfair labor practices. *Amptech, Inc.*, 342 NLRB 1131, 1135 (2004).

Once the General Counsel establishes its prima facie case, the burden of persuasion then shifts to the employer to "demonstrate that the same action would have taken place even in the absence of the protected conduct." *Septix Waste, Inc.*, 346 NLRB 494, 496 (2006); *Williamette Industries*, 341 NLRB 560, 563 (2004); *Wright Line*, supra. To meet its *Wright Line* burden, "[a]n employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the same action would have taken place in the absence of the protected activity." *W. F. Bolin Co.*, 311 NLRB 1118, 1119 (1993), petition for review denied 70 F.3d 863 (6th Cir. 1995), enfd. mem. 99 F.3d 1139 (6th Cir. 1996). See also *Manno Electric, Inc.*, 321 NLRB 278, 280 fn. 12 (1996).

### 4. Application of the *Wright Line* standards

Here, for the reasons discussed above, I have concluded that Kish was engaged in concerted, protected conduct and Respondent was aware of such conduct. There is some evidence of Respondent's animus toward such conduct in its claims that Kish's protected emails were rude, offensive, inappropriate and insubordinate. I further find evidence of animus toward Kish's protected conduct in the final written warning itself. Contrary to the far more charitable position taken at the hearing regarding employee confusion after the roll out of the IWD policy generally, Respondent maintained that Kish was at fault for not being "proactive" in somehow discerning the unarticulated limits of the comp time policy; and admonished her for an "entirely preventable" problem and "blaming others" for a lack of understanding as to how the IWD policy was to be implemented. Thus, Kish was treated in a disparate, and less favorable manner than other employees: she was reprimanded not only for the manner in which she addressed her superiors, but also for the protected content of her communications.

Moreover, it is apparent that immediately after the emails were sent, and prior to any other superseding event, Respondent's managerial personnel discussed terminating Kish—a decision which Peterson was on record as supporting. Thus, I find that the General Counsel has established a prima facie case that Kish's protected emails were, at the very least, a motivating factor in Respondent's decision to discharge her. Accordingly, it now falls to Respondent to demonstrate, by a preponderance of credible evidence, that it would have discharged Kish notwithstanding her protected conduct.

As an initial matter, as noted above, I have rejected Respondent's contention that it was Kish's conduct at the February 10 disciplinary meeting, and that alone, which led to the decision to discharge her as it is not supported by the evidence. In sum, the authenticity of these contentions is called into question by Respondent's attempts to paint Kish as an employee with a history of inappropriate and insubordinate behavior, Petersen's testimony that prior events (i.e. her "history") entered into his decision to terminate her employment and Kovak's reference to Kish's two warnings in her submission to the Connecticut Department of Labor. Thus, I find it appropriate to consider Kish's employment history in assessing the motive for her discharge.[19]

I begin with a discussion of Kish's prior history of misconduct. Respondent has painted a picture of Kish as an employee with a propensity for improper, offensive, and rude speech in the workplace. Kovak testified to an anonymous note in Kish's file dated sometime in 2011, and another collector who had come to her to complain about Kish's alleged use of foul language. The record reflects that it was in May 2008 (not 2011), that someone left an anonymous note in the company suggestion box complaining of Kish's behavior. No action was taken on this complaint at the time. There is also no evidence that

---

[19] I additionally consider the foregoing to be evidence of so-called "shifting defenses" which in and of itself may be found to constitute evidence of unlawful motive. See *McClendon Electrical Services*, 340 NLRB 613, 614 (2003).

Respondent, at this time investigated any allegation or suggestion that Kish was behaving improperly in the workplace.

It is undisputed that Kish did not receive any discipline relating to an infraction of work rules until September 2010 when she received a written warning for using profanity during a screened telephone call.[20] I credit Kish's testimony that she had never been spoken to regarding her use of profanity prior to this occasion, and note that was unrebutted by any specific credible testimony of Respondent. As for Petersen's vague allusions to "counseling" sessions held with Kish during the period from September 2010 to February 2011, I find such testimony to be inchoate and otherwise unsubstantiated by credible evidence. Had this been an employee who required such repeated interventions, I find it likely that they would have been recorded and made part of Kish's personnel record, especially in light of the prior written warning. In fact, Petersen testified that he makes note of coaching sessions and corrective actions and communicates them to Vice President Collision to keep him apprised of such situations. Kovak also testified that such coaching or counseling sessions should be recorded.[21] No such evidence was presented to support Petersen's claim as regards his repeated coaching of Kish. Further, Kovak's notes make no reference to any prior coaching or counseling and neither does either of Kish's written warnings. Moreover, Petersen admitted that he was unaware of any other example of Kish using profanity out of "thousands" of recordings of her telephone calls. Although Petersen also testified that he did not look for such examples, I find this inherently improbable and actually contradicted by other testimony where Petersen admitted that he had reviewed other calls placed by Kish. Accordingly, I reject Petersen's testimony regarding his alleged coaching of Kish and conclude it is pretextual.

In any event, whatever difficulties Kish may have exhibited in the workplace prior to February 3, 2011, Respondent demonstrated no intent to discharge her until she sent her emails to Morlock, Kovak, and Petersen. After that occurred, members of management communicated among themselves and a discussion about whether to terminate her employment ensued. Respondent tries to minimize the significance of Petersen's email, but it is far from ambiguous. Respondent offered no evidence to shed light on what happened to prompt the apparent reconsideration of this "termination action." In this regard, it must be concluded that it was Kish's protected emails which led Respondent to discuss, consider and express support for her discharge at that time, prior to any alleged insubordination during the administration of her written warning on February 10.

Respondent attempts to downplay the obvious significance of Petersen's February 4 email stating that he agreed with the termination action by relying upon the fact that Petersen subsequently approved Kish's request to work on the President's Day holiday and to take a personal day on February 15. This evidence is unpersuasive, however, because it is inherently improbable that, notwithstanding Respondent's plans regarding Kish's continued employment, Petersen would have replied to Kish in an email or otherwise that it was unnecessary for him to approve the requested personnel actions as her employment was soon to end.

Thus, I conclude that by the time Kish was called into Kovak's office on February 10, Respondent had considered her discharge, in significant part as a result of concerted, protected activity. The question is, therefore, whether Kish's conduct during the disciplinary meeting would have resulted in her discharge absent her protected conduct.

As noted above, there is no evidence that Kish would have ever found herself in the February 10 disciplinary meeting had it not been, at least in part, for her concerted, protected conduct. Moreover, as has been discussed herein, I have found that Respondent's description of Kish's conduct during this meeting is overstated and, in some respects, false. I do conclude, based upon the record as a whole, that Kish stated her disagreement with the discipline, termed it harassment, stated she wanted to consult an attorney, refused to sign the disciplinary form, exhorted "Oh, Please" when being criticized for her conduct, tried to explain that other employees had been adversely affected by the IWD policy and otherwise generally demonstrated her dissatisfaction with being given a warning and a lack of contrition for her actions. With regard to whether such conduct is sufficient to rebut the General Counsel's case that Kish's protected conduct was a motivating factor in her discharge, I note that the Board "cannot substitute its judgment for that of the employer and decide what constitutes appropriate discipline." *Detroit Paneling Systems*, 330 NLRB 1170, 1171 fn. 6 (2000) (and cases cited therein). Nevertheless, I have concluded that the reasons proffered by Respondent are not the "actual" ones, Id. In doing so, I take note of evidence of how Respondent has treated other employees and compare such evidence as to how Kish was treated in this instance.

I find that the General Counsel's evidence relating to the disparate treatment of employees Johnson and Pils to be of relevance here. Johnson, who had received numerous written warnings for performance-related issues, was not disciplined when he told Petersen that he was a liar. Notwithstanding any communications difficulties Johnson may have experienced as regards his work assignments, such a comment appears to be far more disrespectful than anything Kish is alleged to have said or communicated through "negative body language." Similarly, Kovak's notes and Pils' personnel record document a record of repeated work-related misconduct and disrespectful behavior to management; conduct that is at least as, if not more, egregious than anything Kish is alleged (or has been found) to have engaged in. This evidence regarding disparate treatment takes on heightened significance given the fact that both Johnson and Pils were employees with well-documented histories of performance-related difficulties. By contrast, Kish had been a reliable employee who was appreciated for her efforts and acknowledged for her skills. Respondent's decision to treat her more harshly than others with more tarnished employment histories evinces a discriminatory motive. In short, there is a clear disparity between the level of provocation and Kish's

---

[20] Kish also received two warnings for absenteeism but Respondent has acknowledged that they did not play a role in its decision to terminate her employment.

[21] By contrast the warnings issued to both Johnson and Pils document specific instances with dates and details where managerial personnel either "counseled" these employees or "addressed" issues raised by the performance and behavior of these employees.

24                                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

subsequent punishment, when compared with that of other employees.

While Kish never received a termination letter outlining the specific reasons for her discharge, Kovak did provide an explanation to the Connecticut Department of Labor. Among other things, Kovak claimed that Kish was given her second written warning for using foul language and/or disrespectful behavior. However, the record is apparent that Kish never used foul language in her emails or during the disciplinary meeting on February 10. Thus, to a certain extent, Kovak's after-the-fact explanation of the reasons for Kish's termination is questionable.

Thus, based upon the record evidence as discussed above, I find that a variety of factors support the conclusion that Kish's discharge was unlawfully motivated. These include its timing, the disparate treatment of Kish as to that of other employees, expressed hostility toward the content of her emails (irrespective of their tone), and exaggerated, shifting and pretextual reasons for her discharge. Accordingly, I find that Respondent has failed to meet its burden of showing that it would have discharged Kish absent her protected conduct and accordingly find that her discharge violated Section 8(a)(1) of the Act.[22]

### 5. Even assuming Kish did not engage in concerted conduct, her discharge was otherwise unlawful

As an alternative theory, the General Counsel has argued that the facts in this case suggest that even if Kish's conduct is ultimately found not to be concerted, she was discharged pursuant to Respondent's overly broad rule prohibiting "[i]nappropriate behavior while on company property" for conduct that otherwise implicates the concerns underlying Section 7; i.e., protesting a newly implemented employer policy which impacted upon all employees' terms and conditions of employment. *Continental Group, Inc.*, 357 NLRB No. 39, slip op. at 4 (2011). Respondent has denied both that the rule in question is overbroad and that it was applied to discipline Kish.

In *Continental Group*, supra, the Board both reaffirmed and clarified the standard for the application of the so-called *Double Eagle* rule concerning discipline imposed pursuant to a facially overbroad rule.[23] As the Board explained:

> The *Double Eagle* rule provides that discipline imposed pursuant to an unlawfully overbroad rule violates the Act in those situations in which an employee violated the rule by (1) engaging in protected conduct or (2) engaging in conduct that

otherwise implicates the concerns underlying Section 7 of the Act. Nevertheless, an employer will avoid liability for discipline imposed pursuant to an overbroad rule if it can establish that the employee's conduct actually interfered with the employee's own work or that of other employees or actually interfered with the employer's operations, and the interference, rather than the violation of the rule, was the reason for the discipline.

Id. slip op at 4.

I start with an examination of the rule itself.

The analytical framework for assessing whether the maintenance or application of a work rule violates Section 8(a)(1) of the act is set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 647 (2004):

> [A]n employer violates Section 8(a)(1) when it maintains a work rule that reasonably tends to chill employees in the exercise of their Section 7 rights. *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998), enfd. mem. 203 F.3d 52 (D.C. Cir. 1999). In determining whether a challenged rule is unlawful, the Board must, however, give the rule a reasonable reading. It must refrain from reading particular phrases in isolation, and it must not presume improper interference with employee rights. Id. at 825, 827. Consistent with the foregoing, our inquiry into whether the maintenance of a challenged rule is unlawful begins with the issue of whether the rule explicitly restricts activities protected by Section 7. If it does, we will find the rule unlawful.

> If the rule does not explicitly restrict activity protected by Section 7, the violation is dependent upon a showing of one of the following: (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights.

Respondent's prohibition against "[i]nappropriate behavior while on company property" is contained in within a set of rules which delineate other specific infractions, some examples being: falsifying work hours, using abusive or threatening language, sleeping on the job, bribery or harassment, fraudulent misrepresentation, falsifying information or records, and reporting to work while intoxicated. In contrast, Respondent does not specify or suggest what would be considered inappropriate behavior; nor was any testimony adduced during the hearing regarding the application of this rule historically. Kovak acknowledged that the rule was broad in scope and that Respondent would take action based upon what it deemed to be inappropriate.

In contending that the rule is unlawful, the General Counsel argues that the rule in question is facially overbroad because it proscribes a broad spectrum of conduct and contains no limiting language to remove the rule's ambiguity in prohibiting Section 7 activity.[24]

---

[22] I would find the same result to obtain under the *Atlantic Steel* analysis urged by the Respondent. As to the first factor, the disciplinary meeting which triggered Respondent's ultimate decision to discharge Kish took place in Kovak's office and there is no evidence that any employee witnessed the incident or overheard Kish's remarks; the subject matter of the discussion, Kish's emails, was an outgrowth of her earlier protected concerted conduct and, moreover, the nature of Kish's behavior at the meeting (as discussed above) was not sufficiently opprobrious or insubordinate to deprive her of the protections of the Act. Finally, while there is no finding of extant unfair labor practices, this factor standing alone is not sufficient to militate toward a loss of protection, especially given the fact that the warning was a direct response to Kish's protected conduct.

[23] *Double Eagle Hotel & Casino*, 341 NLRB 112 (2004), enfd. 414 F.3d 1249 (10th Cir. 2005), cert. denied 546 U.S. 1170 (2006).

[24] The General Counsel has also argued that the rule in question was also discriminatorily applied toward Kish. However, for purposes of analyzing the lawfulness of disciplinary actions under the *Continental Group* theory, the Board stated as follows:

Respondent, on the other hand, argues that the rule in question does not implicate Section 7 activity. In this regard Respondent relies upon *Lutheran Heritage Village*, supra at 647, where the Board held:

> Where, as here, the rule does not refer to Section 7 activities, we will not conclude that a reasonable employee would read the rule to apply to such activity simply because the rule could be interpreted that way. To take a different approach would require the Board to find a violation whenever the rule could conceivably be read to cover Section 7 activity, even if that reading is unreasonable. We decline to take that approach.

While Respondent concedes that a ban on "inappropriate behavior" might be broadly read as encompassing certain activities that may fall within the parameters of Section 7, it also argues that a finding that this rule would have a chilling effect on Section 7 activity would improperly depend upon a "chain of inferences upon inferences." *Safeway, Inc.*, 338 NLRB 525, 527 (2002). As Respondent contends, the Board is "simply unwilling to engage in such speculation in order to condemn as unlawful a facially neutral work rule that is not aimed at Section 7 activity and was neither adopted in response to such activity nor enforced against it." *Palms Hotel & Casino*, 344 NLRB 1363, 1368 (2005). There, the Board held that it will not assume that the average employee would read a prohibition on abusive or profane language as a ban on Section 7 activities. Here, Respondent argues that its prohibition against inappropriate behavior cannot be properly read to discourage collaboration with colleagues for the purpose of mutual aid and protection. Respondent further argues that its rule is similar to that which prohibits employees from "exhibiting a negative attitude" found to be lawful in *Hyundai America Shipping Agency, Inc.*, 357 NLRB No. 80, slip op. at 2–3 (2011), in that it has no tendency to chill employees in the exercise of Section 7 rights.

In support of its position that the rule in question is unlawful, the General Counsel relies upon *University Medical Center*, 335 NLRB 1318, 1321 (2001), enf. denied 335 F.3d 1079 (D.C. Cir. 2003), where the Board found that a rule which prohibited employees from engaging in "insubordination . . . or other disrespectful conduct toward a service investigator, service coordinator or other individual" was unlawful because of its failure to provide examples of prohibited conduct. I note however, on review in *Community Hospital v. NLRB*, 335 F.3d at 1088–1089, the court, disagreeing with the Board, found that the rule in question applied to "incivility and outright subordination" and that the Board's suggestion that employees would view such a rule as prohibiting Section 7 conduct was "misplaced." The court added: "In short, to quote the Board itself in a more realistic moment, 'any arguable ambiguity' in the rule arises

only through parsing the language of the rule, viewing the phrase . . . in isolation and attributing to the [employer] an intent to interfere with employee rights' *Lafayette Park Hotel* (internal citation omitted)." 335 F.3d at 1089. While the Board decision in *University Medical Center* tends to support the framework of the General Counsel's position here, and I am obliged to follow Board law, I further take note of the history of this case as reflected in subsequent Board decisions. In particular, in *Lutheran Heritage Village*, supra at 647, the Board relied in part upon those court decisions in *Community Hospital*, and *Adtranz ABB Daimler Bentz v. NLRB*, 253 F.3d 19, 25–28 (D.C. Cir. 2001), (reversing in pertinent part 331 NLRB 291, 293 (2000)), to conclude that "a reasonable employee reading these rules would not construe them to prohibit conduct protected by the Act."[25]

Generally, however, the Board has continued to find that a rule's context provides the key to the "reasonableness" of any particular construction. For example, a rule proscribing "negative conversations" about managers that was contained in a list of policies regarding working conditions, with no further clarification or examples, was unlawful because of its potential chilling effect on protected activity. *Claremont Resort & Spa*, 344 NLRB 832, 836 (2005). The Board held that, in the absence of further guidance from the employer, an employee would reasonably construe the rule to limit his or her Section 7 right to engage in protected protest. On the other hand, the Board has also found that a rule forbidding "statements which are slanderous or detrimental to the company" which appeared on a list of prohibited conduct which included "sexual or racial harassment" and "sabotage" would not reasonably be understood to restrict Section 7 conduct. *Tradesmen International*, 338 NLRB 460, 462 (2002). There, the Board found that "employees would not reasonably believe that the . . . rule applies to statements protected by the Act," because it was listed alongside examples of egregious misconduct. Id.

In *Hyundai America Shipping Agency*, supra, relied upon by Respondent, the Board considered several work rules alleged as unlawful. In particular, the Board upheld a rule prohibiting "exhibiting a negative attitude toward or losing interest in your work assignment" and explained that the wording of the rule only applied to an employee's attitude toward his or her work assignment and did not expressly prohibit employee conversations, and thus was less likely to be construed as prohibiting concerted activity. 357 NLRB No. 80, slip op. at 2–3.

Respondent's workplace rule here prohibits "[i]nappropriate behavior while on company property." Although it is listed in a context where numerous other specific infractions are listed,

---

A workplace rule—and any discipline imposed pursuant to that rule—may violate the Act for a number of different reasons. For example, a rule may be facially unlawful; it may have been promulgated for discriminatory reasons or enforced in a discriminatory manner, or it may be overbroad, i.e. it restricts or prohibits some protected, in addition to unprotected activity . . . we emphasize that our analysis here is expressly limited to cases involving discipline imposed pursuant to an unlawfully overbroad rule.
*Continental Group*, supra, slip op. at 2 fn. 6.

[25] In *Adtranz*, the D.C. Circuit vacated the Board's finding that a handbook prohibition against "threatening or abusive language" potentially chilled the exercise of Sec. 7 activities. The *Adtranz* court stressed that threatening and abusive language is not inherent in organizing activities or other Sec. 7 conduct and rejected the argument that mere "unrealized potential" that the rule could reasonably be interpreted as barring lawful union organizing propaganda rendered the rule facially invalid. 253 F.3d at 25–26. The Board applied the reasoning of this decision in *Lutheran Heritage Village* in finding that the rules prohibiting "verbal abuse," "abusive or profane language," or "harassment" to be lawful.

26        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

this particular prohibition is amorphous in nature, and as Kovak essentially acknowledged, could be deemed to cover a broad range of conduct. An employee cannot be sure what his or her superiors would consider "inappropriate"' and this particular rule offers no guidance either through specific examples or limiting language that would exclude Section 7 activity. Thus, it appears that employees would reasonably interpret this rule to prohibit protected activity, including criticism of Respondent's labor policies, treatment of employees and terms and conditions of employment. Moreover, the ambiguity of these words gives the employer inordinate subjective discretion to impose discipline. In this regard I note that employees' Section 7 activities are protected from the subjective reactions of employees or other managers. Thus, work rules which discourage protected conduct based upon whether it is subjectively offensive to other employees or managers are unlawful. See, e.g., *Consolidated Diesel Co.*, 332 NLRB 1020 and fn. 6 (2000) (and cases cited therein), *Martin Marietta Corp.*, 293 NLRB 719, 725 (1989).

Moreover, to the extent there is ambiguity inherent in the rule, the Board has long held that such ambiguities should be construed against the employer. See, e.g., *Lafayette Park Hotel*, supra, 326 NLRB at 828. As the Second Circuit has stated: "[T]he risk of ambiguity must be held against the promulgator of the rule rather than against the employees who are supposed to abide by it." *NLRB v. Miller*, 341 F.2d 870, 874 (2d Cir. 1965).

In *2 Sisters Food Group*, 357 NLRB No. 168, slip op. at 2 (2011), the Board found that it was unlawful for an employer to maintain a work rule that subjected employees to discipline for an "inability or unwillingness to work harmoniously with other employees" because the rule was patently ambiguous and so imprecise that employees would reasonably construe the rule as prohibiting discussions and disagreements between employees that related to protected Section 7 activities. In so doing, the Board distinguished the rules found to be lawful in *Palms Hotel & Casino*, supra at 1367–1368, and *Lutheran Heritage*, supra at 647–649, relied upon by Respondent, because the rules there, "were more clearly directed at unprotected conduct." Id. Similarly, I find that the work rule in question here is sufficiently ambiguous, imprecise and subjective in nature that a reasonable employee would construe it as prohibiting protected conduct which might well be deemed "inappropriate" by his or her superiors. See also *Claremont Resort & Spa*, supra at 832 (rule prohibiting negative conversations generally found unlawful). I therefore find that this work rule violates Section 8(a)(1) of the Act.

I further find that Respondent applied this overbroad work rule to unlawfully discharge Kish.

As noted above, Respondent argues that while Kish engaged in inappropriate behavior, it did not specifically apply the work rule in question to discipline or discharge her. Respondent further argues that the *Continental Group* rule is inapplicable here because Kish was not engaging in protected conduct or in conduct that otherwise implicates the concerns underlying Section 7 of the Act. With regard to the latter argument, as discussed above, I have found that Kish did, in fact, engage in concerted, protected conduct. Even if I were to conclude, however, that her emails were not concerted, I would find that they did impli-

cate terms and conditions of employment for other employees affected by the IWD policy and therefore raise concerns underlying Section 7 of the Act. In particular, as discussed in detail above, Kish's emails complained about the lack of clarity in the newly-implemented IWD policy. She was reprimanded, in part, for raising these complaints. The confusion the roll out of this policy generated among employees and supervisors has been admitted by Respondent. At this time, there were three employees in the collections department who were adversely affected by this lack of clarity and several others working elsewhere in the facility had questions about its implementation as well. As the IWD policy and the manner of its execution clearly had an impact on terms and conditions for Respondent's employees generally, Kish's complaints implicated concerns underlying Section 7 of the Act.

Regarding Respondent's contention that its rule against inappropriate behavior was not applied toward Kish, I find that the record evidence supports the opposite conclusion. As an initial matter, I note that Kovak's email containing the draft of Kish's final written warning states that it is for "inapp." (which Kovak acknowledged referred to "inappropriate") behavior. Petersen acknowledged that Respondent relied upon such conduct in reaching its determination to discharge her. Additionally, as detailed above, it cannot escape notice that Respondent's witnesses frequently characterized Kish's emails and other behavior as inappropriate in their testimony (as did Respondent's counsel in framing his questions). Petersen admitted that when Kish was informed of her discharge, she was specifically told that her behavior was "inappropriate" among other things. While Respondent never specifically cited this rule in documentation relating to Kish's discharge, neither Kovak nor Petersen ever testified that this rule had not been applied to Kish.[26] While Kovak made a general reference to other work rules in her submission to the Connecticut Department of Labor, she failed to identify them, or at the hearing, what other specific rule Kish might have violated which resulted in her discharge.

Finally, there is no contention or evidence that Kish's conduct interfered with her work or the work of others or with the employer's operations. Thus Respondent does not appear to seek, and in any event has not proven the requisite affirmative defense that it was such interference, rather than the work rule itself, that was the reason for her discharge. See *Taylor Made Transportation Services*, 358 NLRB No. 53, slip op. at 1 (2012).

Accordingly, I conclude that the weight of the evidence establishes that Respondent discharged Kish pursuant to a facially overbroad work rule in violation of Section 8(a)(1) of the Act.

### 6. Respondent's rule prohibiting employees from leaving company property without permission is not unlawful

The General Counsel has contended that Respondent's rule prohibiting "[l]eaving the Company or assigned work place other than breaks and meal periods during working hours with-

---

[26] Parenthetically, I note that the foregoing evidence is a demonstration of the ambiguity and inherent subjectivity of the rule itself.

out permission from a supervisor or other person authorized to grant permission" is impermissibly overbroad and its mere maintenance violates Section 8(a)(1) of the Act. Respondent contends that the rule is lawful in that it does not refer to Section 7 activity and the fact that the rule "could" be interpreted to restrict such activity is an unreasonable construction. Respondent notes that the Board, in *Lutheran Heritage Village*, supra at 647, has specifically declined to take such an approach. Thus, because the rule prohibiting unauthorized departures from the workplace and unapproved breaks cannot be found to be overboard without impermissibly "reading particular phrases in isolation" or "assuming improper interference with employee rights" it cannot be construed as restrictive of Section 7 rights, and accordingly is lawful. Id. at 646.

In support of its contentions that the rule in question is unlawful, the General Counsel relies, in part, on *Mission Foods*, 350 NLRB 336, 343 (2007). In that case, however, no exceptions were filed to the administrative law judge's finding that rules prohibiting "leaving company premises without authorization" and "leaving assigned work area or ceasing work without authorization" violated the Act. Id. at fn. 1. Thus, the judge's finding, while affirmed by the Board, cannot be cited as dispositive authority for finding the rule unlawful. See, e.g., *Trump Marina Casino Resort*, 354 NLRB 1027 fn. 2 (2009); *Saginaw Control & Engineering, Inc*., 339 NLRB 541 (2003).

The General Counsel further relies upon *Crowne Plaza Hotel*, 352 NLRB 382 (2008), where the Board found that rules prohibiting employees from "leaving your workstation without authorization before the completion of your shift" and "walking off the job" were unlawful. In so finding, it was noted that under well-settled Board law employees have the right to concertedly refuse to work in protest over wages, hours, or other working conditions. The Board concluded that the rules in question were unlawfully overbroad because an employee would reasonably read these rules as requiring management's permission prior to engaging in such concerted, protected activity, thereby "allowing management to abrogate the Section 7 right to engage in such activity, or altogether prohibiting employees from exercising their Section 7 right to engage in such protected concerted activities." Id. at 387 (footnotes and accompanying citations omitted). However, the ongoing vitality of this decision has subsequently been called into question by the Board. See *2 Sisters Food Group*, supra, slip op. at 3 fn. 10, where the Board, citing *New Process Steel, L.P. v. NLRB*, 130 S.Ct. 2635 (2010), and *Hospital Pavia Perea*, 355 NLRB 1300 fn. 2 (2010), declined to rely upon *Crowne Plaza Hotel*, "a case issued by two Board Members."[27]

In arguing that the work rule in question is lawful, Respondent relies upon *2 Sisters Food Group*, supra, where the Board found rules prohibiting "leaving a department or plant during a working shift without a supervisor's permission" and "stopping work before the shift ends and taking unauthorized breaks" were not impermissibly overbroad. Respondent argues that the rule in question here is "virtually identical" and the same result should obtain. In concluding that such rules were lawful, the

Board found that the rules did not expressly restrict concerted action by employees and, moreover, an employee would not reasonably construe them to prohibit walking off the job. In so finding, the Board distinguished the situation presented in *Labor Ready, Inc*., 331 NLRB 1656, 1656 fn. 2 (2000), where the Board held that a rule prohibiting "walk[ing] off the job" was unlawfully overbroad because employees would reasonably understand such a rule to prohibit Section 7 activity, such as a strike, given the common use of the term "walk out" as a synonym for a strike.

In agreement with Respondent, I find the Board's decision in *2 Sisters* suggests that the challenged rule is not unlawfully overbroad. Like the rules found to be lawful in *2 Sisters*, the rule at issue here prohibits leaving the facility or assigned workplace during work hours (other than during breaks and meal periods) without permission. The Board has found that such language does not suggest an express or implied prohibition on a protected work stoppage or other conduct falling within the ambit of Section 7. Accordingly, I find that Respondent's rule prohibiting employees from "[l]eaving the Company or assigned work place other than breaks and meal periods during working hours without permission from a supervisor or other person authorized to grant permission" is not violative of Section 8(a)(1) of the Act and recommend that this allegation of the complaint be dismissed.

### 7. The standard Board remedy is appropriate and warranted

Respondent argues that even if it is found to have discharged Kish in violation of Section 8(a)(1), a make-whole remedy consisting of backpay is barred by Section 10(c) of the Act.[28] In support of this argument, Respondent contends that the record shows that the decision to discharge Kish was based in its entirety on her behavior during the February 10 disciplinary meeting, and although there is disagreement on what transpired at that meeting, it is not alleged nor can it be found that Kish did anything of a concerted, protected nature at that time. Thus, Kish was terminated for "cause" and a backpay remedy is foreclosed. In support of these contentions, Respondent relies upon *Taracorp Industries*, 273 NLRB 221, 222 (1984) ("[A]n employee disciplined or discharged for misconduct or any other nondiscriminatory reason is not entitled to reinstatement or backpay even though the employee's Section 7 rights may have been violated by the employer in a context unrelated to the discharge or discipline"); *Anheuser-Busch, Inc.*, 351 NLRB 644, 647 (2007) ("Since the discipline imposed here was not imposed for a prohibited reason, it was 'for cause.' Accordingly Section 10(c) precludes the Board from granting a make whole remedy. . . .").

The weight of the evidence runs contrary to Respondent's characterization of events. As noted above, Petersen testified that Kish's prior incidents had an effect in the decision to discharge her. This is reflected in his February 4 email where he is on record as supporting the termination decision. Elsewhere in

---

[27] In this regard, I note that *Mission Foods*, relied upon by the General Counsel, was also a decision issued by two Board Members.

[28] Respondent appears to be under the impression that the General Counsel is seeking back pay but not reinstatement for Kish; however, the complaint does not so indicate and there is no indication in the record that this is the case.

28                                       DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

its post hearing brief, Respondent appears to argue that a prior history of "comparable misconduct" contributed to the decision to discharge Kish; and I note that Respondent devoted a considerable portion of the trial and its brief documenting such alleged misconduct.

Finally, as discussed above, I have found based upon the record as a whole that Kish's protected, concerted emails played a significant role in the decision to discharge her and Respondent has not been able to show by a preponderance of the credible and otherwise reliable evidence that she would have been discharged notwithstanding this conduct. Alternatively, the record shows that Kish was unlawfully discharged pursuant to an overbroad work rule for conduct which implicates the protections of Section 7 of the Act. Accordingly, it cannot be said that her discharge was for cause. Therefore, the Board's traditional remedy of reinstatement and backpay is an appropriate one.

### CONCLUSIONS OF LAW

1. By maintaining a work rule prohibiting "[I]nappropriate behavior while on Company property," Respondent has engaged in unfair labor practices within the meaning of Section 8(a)(1) of the Act.

2. By discharging Virginia Kish because of her concerted, protected activities and pursuant to the work rule described above, Respondent has engaged in unfair labor practices within the meaning of Section 8(a)(1) of the Act.

3. The unfair labor practices described above affect commerce within the meaning of and Section 2(6) and (7) of the Act.

### REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Having found that Respondent violated Section 8(a)(1) by maintaining a work rule prohibiting "[i]nappropriate behavior while on Company property," I recommend that Respondent be ordered to revise or rescind such rule. Having discriminatorily discharged Kish, Respondent must offer her reinstatement and make her whole for any loss of earnings and other benefits. Respondent shall also be directed to expunge Kish's record from any reference to her discharge and notify her in writing that this has been done, and that her discharge will not be used against her in any way. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB No. 8 (2010), enf. denied on other grounds sub nom. *Jackson Hospital Corp. v. NLRB*, 647 F.3d 1137 (D.C. Cir. 2011).

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[29]

---

[29] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopt-

### ORDER

The Respondent, Hitachi Capital America Corp., Norwalk, Connecticut, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining or enforcing a work rule that prohibits "[i]nappropriate behavior while on Company property."

(b) Discharging employees because they engage in concerted, protected activities or because they violate the rule described above.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days of the Board's order, revise or rescind the rule prohibiting "[i]nappropriate behavior while on Company property."

(b) Within 14 days from the date of the Board's Order, offer Virginia Kish full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(c) Make Virginia Kish whole for any loss of earnings and other benefits suffered as a result of the discrimination against her, in the manner set forth in the remedy section of this decision.

(d) Within 14 days from the date of the Board's Order, remove from its files any reference to the unlawful discharge and within 3 days thereafter notify Kish in writing that this has been done and that the discharge will not be used against her in any way.

(e) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(f) Within 14 days after service by the Region, post at its facility in Norwalk, Connecticut, copies of the attached notice marked "Appendix."[30] Copies of the notice, on forms provided by the Regional Director for Region 34 after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of

---

ed by the Board and all objections to them shall be deemed waived for all purposes.

[30] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

HITACHI CAPITAL AMERICA CORP.                                                29

business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 10, 2011.

(g) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.   July 11, 2012

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain or enforce a work rule that prohibits "inappropriate behavior while on Company property."

WE WILL NOT discharge you because you engage in concerted, protected activities or because they violate the rule described above.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed to you by Section 7 of the Act.

WE WILL within 14 days of the Board's order, revise or rescind the rule prohibiting "inappropriate behavior while on Company property."

WE WILL within 14 days of the Board's order offer Virginia Kish full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL within 14 days of the Board's order make Virginia Kish whole for any loss of earnings and other benefits suffered as a result of the discrimination against her.

WE WILL within 14 days of the Board's order remove from our files any reference to the unlawful discharge, and WE WILL, within 3 days thereafter notify Virginia Kish in writing that this has been done and that the discharge will not be used against her in any way.

HITACHI CAPITAL AMERICA CORP.